670 A.2d 1172

**COMMONWEALTH of Pennsylvania**

v.

**Anthony TOLBERT, Appellant**

**COMMONWEALTH of Pennsylvania**

v.

**John SMITH, Appellant**

Superior Court of Pennsylvania.

Argued Aug. 3, 1995.

Decided Dec. 20, 1995.

Reargument Denied Feb. 29, 1996.

190

194

196

Albert J. Flora, Jr., Assistant Public Defender, Wilkes–Barre, for appellants.

Peter Paul Olszewski, Jr., District Attorney and Scott C. Gartley, Assistant District Attorney, Wilkes–Barre, for Com.

Before BECK, SAYLOR and HESTER, JJ.

BECK, Judge:

These appeals require us to address the complex issue of collateral estoppel in criminal retrials. Our review of the record leads us to affirm the judgment of sentence in appellant Smith's case and affirm the collateral order in appellant Tolbert's case. A thorough summary of the history of the cases, both factual and procedural, must precede our analysis.

Appellants Anthony Tolbert and John Smith were accused, along with another man named Anthony Russo, of beating to death the victim, Hector Maldonado. The Commonwealth's theory of the case began with Maldonado's failure to deliver to Russo some drugs that Russo paid Maldonado to secure. After the drug transaction went awry, Russo, Tolbert and Smith searched for Maldonado on the evening of February 28, 1991. The three men went to Maldonado's residence, spoke to his girlfriend, and ultimately found Maldonado in the early morning hours of March 1, 1991 in the parking lot of Fay's drug store in Wilkes–Barre.

Upon finding Maldonado, the men began to beat him severely. They dragged him into a car (Russo's) and continued to beat him as they drove away. They later dumped his body on the roadside. Maldonado was discovered later by a man delivering newspapers and was taken to the hospital where he underwent brain surgery. He never regained consciousness and later died from blunt force trauma to the head and face.

Police sought out and questioned Tolbert and Smith about their involvement in the case; however, police never succeeded in locating Russo.[1] Ultimately, Tolbert and Smith were charged with murder, kidnapping and conspiracy to commit murder and kidnapping. They were tried jointly and both testified. Essentially, they admitted to being present in the parking lot during Maldonado's initial beating but insisted that it was only Russo who beat Maldonado. Both Tolbert and Smith claimed that they did not know Russo was looking for

1. Russo remains a fugitive in this case.

Maldonado; instead they thought they were accompanying Russo to the home of a girlfriend who needed assistance. Tolbert. and Smith further claimed that after Russo beat Maldonado in the parking lot, Russo drove them home. Russo, they insisted, left them at Tolbert's house and drove off with Maldonado, who, despite his injuries, was alive and well when they last saw him.[2]

The jury returned verdicts of not guilty for both men on the charges of first degree murder, second degree murder, voluntary manslaughter, kidnapping and conspiracy, but was deadlocked on the charge of third degree murder. After the verdicts, defense counsel filed a motion to dismiss the charge of third degree murder based on double jeopardy and collateral estoppel. The trial court denied the motion and the denial was appealed to this court. A panel of this court held that retrial for third degree murder was not barred by double jeopardy or collateral estoppel since the hung jury was the impetus for the retrial. The Pennsylvania Supreme court denied allocatur and the matters were remanded for retrial. *Commonwealth v. Smith,* 426 Pa.Super. 31, 626 A.2d 178, 181 (1993), *allocatur denied,* 537 Pa. 634, 642 A.2d 487 (1994).

Tolbert and Smith, who requested severance on retrial, then filed motions in limine seeking to preclude the admission of certain evidence on collateral estoppel grounds. The motions sought a pre-trial ruling prohibiting the Commonwealth from presenting:

evidence or theories that appellants intended to kill Maldonado;

evidence or theories that appellants removed Maldonado from the parking lot by force or threat of force;

evidence or theories that appellants killed Maldonado in the course of committing a felony;

evidence or theories of a conspiratorial agreement between appellants to kill, seriously injure, or act maliciously toward Maldonado.

2. The defense theory of the case was that Russo left appellants at Tolbert's house and went in search of Charles Wested, who was supposed to have assisted Maldonado in getting the drugs for Russo.

evidence or theories of any actions or statements of one appellant at the retrial of the other appellant.

In its order granting the motion in limine in part and denying it in part, the trial court ruled that the Commonwealth was barred from referring to, introducing or offering 1) evidence of any criminal conspiracy to kill Maldonado, 2) evidence that the murder was committed with a specific intent to kill and 3) evidence of kidnapping. The court further ruled that the Commonwealth would not be barred from presenting relevant evidence pertaining to the charge of third degree murder and that with respect to the manner of proof, all evidentiary objections made by the defense would be decided at trial.

Once these rulings were made, Tolbert's and Smith's cases took different routes. Smith was retried and found guilty of third degree murder. After Smith's conviction, Tolbert filed a Motion for Collateral Order. In it he sought to prohibit the Commonwealth from utilizing a theory of accomplice liability to prove third degree murder since a previous acquittal of conspiracy had occurred. Tolbert requested that the trial court rule on the propriety of the Commonwealth's intention to retry him for third degree murder using an accomplice theory and evidence of those charges (specifically conspiracy to commit homicide and kidnapping) of which he had been acquitted. The trial court ruled that the government could go forward with an accomplice theory of liability on retrial and was permitted to present evidence of conspiracy at Tolbert's retrial.[3] Tolbert appealed the trial court's order to this court and the Commonwealth responded by filing a motion to quash the appeal as interlocutory. The full Superior Court denied

3. We note that the trial judge previously ruled that the Commonwealth was precluded from offering evidence of intent to kill, a criminal conspiracy or kidnapping. However, in response to Tolbert's Motion for Collateral Order, the trial court ruled that the Commonwealth was not precluded from using evidence of the conspiracy at the retrial. These rulings appear contradictory; however, when viewed in light of the specific evidence sought to be excluded, they may well be appropriate.

the motion to quash and allowed the matter to go forward.[4]

As a result of all this legal maneuvering, we now have before us both Smith's and Tolbert's cases. Appellants share two issues which we must resolve. First, we must decide whether the Commonwealth should be precluded from advancing a theory of accomplice liability on retrial when the first trial resulted in an acquittal on the conspiracy charges. Second, we must decide what evidence the Commonwealth is entitled to use at appellants' retrials in light of Pennsylvania law on collateral estoppel and double jeopardy. Since resolution of the second issue provides an answer to the first, we will begin with the second issue.

The fifth amendment double jeopardy clause insures that no citizen shall be twice placed in jeopardy for the same offense. Among other things, the clause protects an individual who has successfully defended himself in a prior proceeding from having to once again face prosecution for the same crime. Collateral estoppel, or issue preclusion, is a concept that is embodied in the guarantee against double jeopardy; it provides that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future court proceeding. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).

The application of collateral estoppel to criminal law was first articulated by the United States Supreme Court in *Ashe*. There, several masked men robbed six other men who were engaged in a poker game. Wielding guns, the robbers took money and personal property from each of the six victims and fled. Ashe was arrested and went to trial for the robbery of one of the victims. The government's case against Ashe was weak; none of the robbery victims could positively identify him and there were discrepancies among the victims' testimony as to the number of assailants. Ashe was acquitted. Six weeks later, the government again tried Ashe, this time for

---

4. Our opinion today does not address the propriety of Tolbert's motion in the trial court or his appeal to this court.

the robbery of another one of the six victims. The second trial included most of the same witnesses, although the second time around they were more confident in their recollection that Ashe resembled and sounded like one of the robbers. The second jury returned a verdict of guilty.

The *Ashe* court explained the manner in which collateral estoppel is to be applied:

Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."

*Id.* at 444, 90 S.Ct. at 1194 (citations omitted). In reversing the judgment of sentence, the *Ashe* Court stated that the only rational issue to be decided by the first jury was whether Ashe had been one of the robbers. Because the jury decided that he had not, a second prosecution seeking resolution of that same issue was barred. *Id.* at 445, 90 S.Ct. at 1195.

In *Commonwealth v. Hude*, 492 Pa. 600, 425 A.2d 313 (1980), our supreme court addressed the issues raised in *Ashe* and applied the bar of collateral estoppel to the facts before it. Manfred Hude was accused of participating in twenty drug transactions with an individual named Barry Hagemus. At his first trial, Hude faced three possession and delivery counts involving Hagemus. The Commonwealth relied solely on the testimony of Hagemus to establish Hude's guilt but Hude denied all involvement with Hagemus. The jury acquitted Hude of all three charges. Later, Hude again faced prosecution for some of the remaining counts of possession and delivery to Hagemus. This time he was convicted of some of the counts, though his judgments of sentence were reversed. After the second trial, the Commonwealth brought perjury charges against Hude for a statement he made when he

testified at his first trial.[5] Once again, the prosecution relied on the testimony of Hagemus to prove Hude's guilt and Hude was found guilty of perjury. On appeal, the Pennsylvania Supreme Court applied *Ashe* and reversed the perjury conviction.

After carefully scrutinizing the record as required by *Ashe,* the *Hude* court noted that the first trial had been a battle of credibility, that is, Hagemus testified to Hude's participation in the drug transactions and Hude denied all involvement.

> The [first] jury was forced to either accept Hagemus' testimony or acquit. They followed the latter course. Thus the critical, in fact the sole issue litigated at the first trial was the credibility of Hagemus, and the jury resolved that issue against the Commonwealth.

*Hude,* 492 Pa. at 616, 425 A.2d at 322. The court found that in view of the testimony presented, the first jury's rejection of Hagemus's testimony was the only rational explanation for its verdict. Labeling the perjury action as nothing more than a thinly veiled attempt to retry the issue of Hagemus's credibility, the court held that the issue had already been litigated and collateral estoppel prevented its relitigation. *Id.*

Our supreme court again visited this issue in *Commonwealth v. Cohen,* 529 Pa. 552, 605 A.2d 1212 (1992). Stuart Cohen was charged with the murder of his ex-girlfriend's fiance. At trial, the Commonwealth presented the testimony of three men who claimed they were hired by Cohen to kill the victim. Cohen denied that he hired the men to kill the victim; he testified that he paid them to "scare the victim," or have him "shoved around" or "messed up." The jury was charged on first and third degree murder as well as conspiracy.

During deliberations, the jurors asked the following question: "Does the conspiracy to frighten or beat become a conspiracy to commit murder with the death of the victim, even though the death was unintentional?" The trial judge

5. Hude's attorney asked him if he ever sold drugs and Hude replied that he had not.

responded that murder included an unlawful killing of a human being with malice, even where the intent of the defendant was merely to commit grievous bodily harm and not to take a human life. The jury then returned verdicts of not guilty of first degree murder, but guilty of third degree murder and conspiracy to commit murder.

Cohen's convictions were later reversed based on pre-trial publicity and other issues. At the retrial for third degree murder and conspiracy, Cohen filed a motion in limine requesting that the Commonwealth be barred from introducing evidence of intent to kill as that issue had already been resolved in Cohen's favor at the first trial. The trial court granted the motion and the Commonwealth appealed. Applying the rationale of *Ashe* and *Hude*, the *Cohen* court held that no evidence of intent to kill could be offered by the Commonwealth. In reviewing the entire record, the court noted that Cohen's first jury clearly decided that the murder was not intentional because Cohen was acquitted of first degree murder; therefore, the Commonwealth was barred by collateral estoppel from advancing any theory or presenting any evidence which claimed otherwise. *Id.* at 563–65, 605 A.2d at 1218.

Pursuant to the relevant case law set out above, we begin our analysis by reviewing the elements of the crimes for which appellants were charged at the first trial. In all homicide cases, the prosecution must prove that the victim is dead and that the defendant is responsible for the death. However, the various types of homicide require differing burdens of proof. First degree murder is the killing of another with malice and a specific intent to kill. Second degree murder is the killing of another with malice during the commission of a felony. Third degree murder is a killing done with malice that is neither intentional nor committed in the course of a felony. Voluntary manslaughter is the intentional killing of another without malice but in a sudden heat of passion brought on by legal provocation.

 Kidnapping is the forcible confinement of another in a place of isolation for a substantial period, with the intention to inflict bodily injury or terror. Conspiracy is an agreement with another to engage in conduct which constitutes a crime and the commission of an overt act pursuant to the conspiracy.[6]

The recitation of these elements does not, in itself, permit us to conclude exactly what issues the jury fully resolved. Indeed, no amount of review will ever provide us with the actual decisions made by the jurors. An analysis of the elements, however, can lead us to make some broad preliminary conclusions regarding the jury's actions.[7]

It is clear that the the jury found Maldonado's death was not the result of a specific intent to kill because appellants were found not guilty of first degree murder. The jury also decided that Maldonado's death was not committed by appellants during the course of a felony because they were found not guilty of second degree murder. We can also conclude that the jury found the killing was not committed in the heat of passion brought on by legal provocation because appellants were found not guilty of voluntary manslaughter.

The jury must have decided there was no agreement among appellants to murder or kidnap Maldonado because they were acquitted of conspiracy. In addition, the jury determined that appellants did not forcibly confine Maldonado to the car with an intent to harm or terrorize him because they were found not guilty of kidnapping.

**6.** Many of the offenses with which appellants were charged have alternate definitions or elements that do not apply to the facts of this case. For instance, it is possible to be guilty of voluntary manslaughter in the case of mistaken self-defense. It is also possible to be guilty of kidnapping where one removes the victim a substantial distance with the intent to hold the victim for ransom or reward. We recite here only those "versions" of the crimes which are applicable to the facts and on which the jury was charged.

**7.** We will assume that the jury was satisfied with the Commonwealth's proof that Maldonado was, in fact, dead and his death resulted from a severe beating at the hands of another or others.

These broad conclusions aside, we are left with the more difficult task of assessing what particular evidence is admissible on retrial.[8] While the acquittal of first degree murder prohibits the prosecution from advancing a theory of intent to kill Maldonado, just what evidence is precluded as a result of that prohibition is a more complex inquiry. Surely, a statement made by appellants such as "let's go kill Maldonado" would be inadmissible because it bears directly on intent. But other evidence is not so easily excluded or admitted. While appellants asked only that "evidence of any intent to kill" be deemed inadmissible, and the trial court granted that request, we would be remiss if we did not provide a closer analysis.

■■■ We hold that only those facts which were necessarily determined in appellants' favor in the first trial are precluded from relitigation, while those facts that may have been determined in appellants' favor in the first trial are not precluded. Once it is clear that the jury has spoken with respect to a particular fact, the Commonwealth is no longer permitted to

**8.** We note for the record the manner in which appellants have framed the issue for our review. Appellant Smith, despite the luxury of a complete transcript from the second trial, makes no specific objections to witnesses and/or testimony. Instead, Smith broadly claims that the Commonwealth "is collaterally estopped from using any evidence of those charges [of which Smith was acquitted] in the retrial," and argues generally that at Smith's retrial, the Commonwealth should have been collaterally estopped from "introducing evidence of any intent to kill, any agreement to commit a homicide, shared intent to kill or inflict serious bodily injury, the joint beating and forcible removal of Maldonado from Fay's parking lot, any subsequent beating, the confinement of Maldonado in the Russo vehicle and the dumping of Maldonado's body...." *See* Brief for Appellant Smith at 18–19. Tolbert's brief makes the same general objections to evidence he anticipates will be offered at his retrial. *See* Brief for Appellant Tolbert at 19–20.

Not only are appellants' presentations of the issue inappropriate under the Rules of Appellate Procedure, *see* Pa.R.App.P. 2119(c); they are at odds with the manner in which a collateral estoppel claim is to be analyzed. A collateral estoppel claim requires a thorough examination of the record(s), the pleadings, the evidence, the charge, and any other relevant matter. *See Cohen*, 529 Pa. at 559–61, 605 A.2d at 1216 (citing *Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)). While we recognize the importance of appellants' claims, we stress the requirement in this and every case that parties present a complete appellate brief, which includes objections to specific testimony and references to the record.

request that another jury consider the same.[9]

We offer the following example to illustrate the necessity for a detailed analysis. Let us assume that Maldonado's death was caused by several bullet wounds to the chest and the Commonwealth's theory of the case was that each of the appellants shot at the victim. When deliberating in a first degree murder case, jurors are permitted to infer intent from a variety of circumstances. For instance, the use of a deadly weapon on a vital part of the body can be the basis for a finding of specific intent to kill. *Commonwealth v. Marshall*, 534 Pa. 488, 633 A.2d 1100, 1106 (1993). The question would then arise whether, since evidence of specific intent to kill was precluded under collateral estoppel, all evidence which *could be* used to establish specific intent, *i.e.*, the manner of Maldonado's death, was inadmissible.

A common-sense analysis of the purpose and intent of the doctrine of collateral estoppel leads us to respond in the negative to this question. Collateral estoppel simply does not apply to all evidence a jury may have utilized in reaching its decision. Indeed, the very standard by which evidence is to be excluded under the doctrine belies such a broad interpretation. The collateral estoppel inquiry is whether a rational jury grounded its verdict upon the very fact the defendant seeks to foreclose from consideration. *See Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194. Where one or several other rational explanations for the jury's actions exist, admission of evidence will not be excluded on collateral estoppel grounds.

9. The use of the words fact and issue becomes tedious in these types of analyses. Collateral estoppel is issue preclusion, however, it is the facts underlying an issue that are sought to be foreclosed at retrial. Here, the first jury clearly decided the issue of intent. There are many pieces of evidence, or "facts," the Commonwealth seeks to present to the second jury which *may* support intent and which the first jury *may* have accepted or rejected in reaching its decision on the issue of intent. Only those evidentiary "facts" which had to have been decided in appellants' favor when the first jury concluded there was no intent to kill are precluded from admission at the retrial.

It is important to remember that when conducting this analysis, we are not to apply the law to the facts in a hypertechnical manner, nor are we to perform "mental gymnastics" in an effort to avoid the bar of double jeopardy. Instead, we are to approach the issue with realism and rationality. *See Ashe v. Swenson, supra; Commonwealth v. Hude, supra.*

Returning to our hypothetical fact pattern, we would make the following analysis. Since a jury is merely *permitted* to infer specific intent on the basis of evidence that a defendant used a deadly weapon on a vital body part, but is not *required* to do so, there exists more than one rational explanation for the jury's verdict, that is, there is more than one reasonable conclusion that could be reached from an assessment of the evidence. Therefore, it would be improper to preclude from the second jury's consideration evidence of the manner of death merely because the first jury *could have* used it to find specific intent to kill.

We believe this standard reflects a reasonable and equitable manner in which to proceed in these types of cases. Further, its logic is supported by other case law on this issue. *See e.g., United States v. Irvin,* 787 F.2d 1506, 1515 (11th Cir.1986) ("[T]he fact sought to be foreclosed by the defendant must necessarily have been determined in his favor in the prior trial; it is not enough that the fact *may* have been determined in the former trial."); *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979) (defendant carries the burden of proving that "the fact-finder acquitted him because it resolved in his favor the very issue he seeks to foreclose from consideration . . .")

The broad rulings sought by appellants leave open the potential for further litigation regarding their definition and intent. In an effort to resolve the collateral estoppel issue for appellants properly and completely, we have examined closely the transcript of Smith's retrial. We have reviewed the evidence presented by each Commonwealth witness at Smith's retrial for third degree murder to determine whether some or

all of that evidence should have been excluded on collateral estoppel grounds.

Our decision is guided by the entirety of the record, including the transcripts of the first trial, the complaints and the statutory elements of all the crimes charged. Our rulings necessarily address the concerns raised by both appeals and provide guidelines for the admission of evidence at the Tolbert retrial. For clarity's sake, we have conducted our analysis of the evidence piece by piece.

The first Commonwealth witness to testify against Smith at his retrial was Cynthia Johns, Maldonado's girlfriend. Johns told the jury that she was home on the evening of the murder waiting for Maldonado to return her car. Appellants appeared at the house with Russo, demanding to know where Maldonado was. She told them she did not know and the three men left. They returned later and were inside her home when Maldonado called her. Johns wrote down the number of the telephone from which Maldonado was calling and Smith saw it. He recognized the number, grabbed the piece of paper and exclaimed that he knew the origin of the call. With that, all three men left Johns's residence.

It appears from the record that Smith's counsel objected to most of Johns's testimony, including her use of the pronoun "they." Appellants sought to exclude all evidence which tended to establish that appellants were together on the evening of the murder and were looking for Maldonado. They assert that the conspiracy acquittal precludes admission of all evidence of shared intent or joint action.

Appellants' request for the exclusion of evidence of the search for Maldonado cannot be sustained on the basis of collateral estoppel. The conspiracy acquittal does not necessarily lead to the conclusion that the jury rejected Johns's testimony about the visits she received from appellants earlier in the evening. The essential element of conspiracy is an agreement. Our legislature has chosen to punish the act of agreeing to commit a crime. That the jury concluded appellants did not agree among themselves to commit the crimes of

murder or kidnapping, does not mean that it rejected all evidence of appellants' joint actions that evening. It is entirely reasonable that the jury accepted Johns's testimony regarding appellants' search for Maldonado, yet rejected the notion that appellants agreed among themselves to kill, hurt or kidnap Maldonado.

Appellants use this same argument to support exclusion of the testimony of witnesses who claimed that more than one person was engaged in the beating of Maldonado in the parking lot. Alleged eyewitnesses Jeanette Wickkiser, Serena Smith, Thomas Volinski, Milton Bastian, George Sheakoski and James Dougherty all testified to observing the victim being beaten by more than one person.[10]

■■■■ Exclusion of all evidence of joint action on the part of appellants is inappropriate. It is true, as appellants note, that a jury is entitled to infer an agreement between participants from the actions they take; however, a jury is not required to reach such a conclusion. *Commonwealth v. Smith,* 414 Pa.Super. 208, 606 A.2d 939 (1992) (agreement necessary to establish conspiracy *may be* inferred from relationship of the parties and circumstances of the crime) (emphasis supplied), *allocatur denied,* 533 Pa. 624, 620 A.2d 490 (1993). Clearly, not all crimes committed by more than one person support a conviction for conspiracy. It is improper to conclude that because the jury found appellants not guilty of conspiracy, all evidence of joint action must be excluded. Evidence of appellants' search for Maldonado and the beating of Maldonado by two or more persons is not barred by collateral estoppel and is admissible at the retrial. *See Commonwealth v. Breeland,* 445 Pa.Super. 147, 664 A.2d 1355 (1995) (appellant's acquittal on conspiracy charges in federal court does not preclude state court prosecution for underlying

10. Wickkiser is a prostitute who was in the vicinity of Fay's that night. Smith lived nearby and watched the incident from her window. Volinski and Bastian were in a car when they observed the men. They drove into the parking lot and Bastian spoke with Smith. Sheakoski and Dougherty are postal workers who had a view of the parking lot from the nearby post office.

substantive crimes as jury may have concluded simply that there was no agreement between appellant and his cohorts).

Some of the eyewitnesses named above testified that they saw Maldonado being "dragged" into a car and taken from the parking lot. Appellants argue this evidence is inadmissible because the jury's verdict of not guilty of kidnapping conclusively established that appellants played no part in removing Maldonado from the lot. Appellants insist the verdicts show that the jury accepted appellants' claims that they were not involved in Maldonado's beating or transport from the lot to the location at which he was found. We assume that this same argument forms the basis for appellants' assertions that all evidence of forcible removal, subsequent beating in the car and confinement in the car is inadmissible.[11]

We fail to see how the kidnapping acquittal necessarily leads to the conclusion that the jury could only have accepted appellants' version of events. Considering the elements of the crime of kidnapping, several possible explanations exist for the jury's verdict. It may be, as argued by appellants, that the jury believed appellants were merely innocent bystanders who had no hand at all in Maldonado's brutal death.[12] It might also be that the jury did not find that appellants were responsible for placing Maldonado in the car and, therefore, did not "forcibly confine" him.[13] The jury also could have decided

11. Appellants also argue that evidence of the dumping of the body should be excluded. While their briefs do not elaborate on why this is so, we suspect that it is merely an extension of their argument that all joint action should be excluded. It may also be appellants are arguing that since the jury accepted their version of events as true, evidence of what occurred after they got out of Russo's car should not be admissible. We refuse to make the leap that appellants do in concluding that the jury fully accepted their testimony and rejected that of the Commonwealth witnesses.

12. Of course, the deadlocked vote on third degree murder leads us to conclude that at least one person believed otherwise.

13. Testimony from the eyewitnesses varied as to how Maldonado got into the car. Some said one person put Maldonado in the vehicle, others testified merely to Maldonado being dragged into the car by "the men." Appellants claimed that Maldonado got into the car in order to take Russo to where the drugs were.

that at the time Maldonado was placed in the car, appellants did not intend to hurt him any further.[14]

We conclude that the evidence appellants sought to foreclose regarding Maldonado's removal, subsequent beating and confinement in the car falls into the category of facts that *may* have been resolved in appellants' favor at the prior trial, not facts that *necessarily* were determined in their favor. *See Irvin, supra.* As such, their admission at the second trial is not barred by collateral estoppel.

In addition to the eyewitnesses, there were others who testified for the Commonwealth at Smith's retrial. We briefly summarize their testimony for the sake of thoroughness.

Milton Bastian not only testified to witnessing the beating at the parking lot, he also had contact with appellant Smith after the murder.[15] Bastian lived next door to Georgette Nealon, Smith's ex-girlfriend and the mother of his children. Bastian claimed he saw Smith at Nealon's house two days after the murder. Smith told Bastian that if he was asked about what he saw at the parking lot, Bastian was to explain that he was too drunk to remember. Bastian also said that when he used Nealon's bathroom later that day, he saw a pair of sneakers there that were stained with blood.

Smith makes no specific argument supporting the exclusion of Bastian's testimony and we can think of no reason that it should have been excluded. It cannot be argued that the prior acquittals have any impact on the admissibility of Bastian's testimony.

Nealon also testified for the Commonwealth. She claimed that after Bastian told her what he observed in the parking lot, she asked Smith about it and he said that Maldonado "got what he deserved." Nealon also testified that Smith admitted he was involved in Maldonado's death "a little bit more than he should have been" and that "things happened

14. There was some testimony from appellants that Maldonado told Russo he would take him to Wested.

15. Bastion testified at the first trial but could not be located for Smith's retrial. His prior testimony was read into the record.

so quickly that he never thought they would go as far as they did." When Nealon asked Smith if he had any physical contact with Maldonado, he would not respond. Again, we see no reason why any of Nealon's testimony would be rendered inadmissible in light of the not guilty verdicts at the first trial.[16] None of Nealon's testimony concerned an issue necessarily resolved in Smith's favor at the first trial.

Smith's girlfriend at the time of the murder, Erin Houseman, also testified for the Commonwealth at the second trial.[17] She testified that she was with Smith, Tolbert, Tolbert's girlfriend, Russo and Russo's girlfriend on the night of the murder. At some point the men left and the women returned to Tolbert's house. Houseman fell asleep and was awakened when she realized that Tolbert and Smith had returned. Smith was lying on the floor next to her when Houseman noticed blood on his jeans. She asked him about it and he replied that it was Maldonado's blood. The following day, Smith asked Houseman to bleach his jeans, which she did. Houseman also said that Smith told her they "got" Maldonado and dropped him off on the street, but thought he was okay.

■■■ Again, we see no reason to exclude any of Houseman's testimony based on collateral estoppel. While she testified to the joint actions of Tolbert and Smith, our previous discussion regarding the conspiracy acquittal and what it precluded fully address this issue.

The remaining witnesses presented by the Commonwealth at Smith's retrial consisted mostly of law enforcement personnel, including those officers summoned to the crime scene, those officers who investigated the case and interviewed ap-

16. Nealon did not testify at the first trial. Apparently, she and Smith resumed their relationship while he was in jail awaiting trial. Nealon attended the trial in support of Smith and celebrated the acquittals with Smith and his family. She also gave a statement to Smith's counsel which helped Smith's defense. Shortly after the first trial, Smith and Nealon again parted ways. At the second trial, when she testified for the Commonwealth, she admitted that her statement to defense attorneys was fabricated in an effort to aid Smith.

17. Smith and Houseman broke up shortly after Smith's arrest. Smith then began seeing Nealon again.

pellants, scientists who did blood and fiber analyses, and the coroner. Appellants properly make no collateral estoppel challenges to their testimony.

 An overview of the entire record in this case leads us to conclude that the trial court carefully and thoroughly presided over these cases at the first trial, the second trial and all motions and arguments in between. The trial judge's initial order denying use of all evidence of intent to kill and an agreement to kill or kidnap was appropriate. Further, his order declaring that all specific objections to evidence based on collateral estoppel would be dealt with at time of trial was a sensible one due to the complexity of these cases and the various ways in which proof could be presented.

 Even the trial court's later ruling in Tolbert's case, which permitted the Commonwealth to offer evidence of conspiracy was essentially correct. Appellant Smith objected to all evidence of joint action, including use of the word "they." As our preceding discussion indicates, evidence which could prove an element of conspiracy is not automatically excluded when an acquittal on that charge occurs in a prior proceeding. As *Ashe* and *Cohen* instruct, a definitive finding of issue preclusion must be made before any evidence can be deemed inadmissible. With respect to some of the evidence that could be utilized to establish conspiracy, no such finding can be made. Because the first jury could have acquitted appellants of conspiracy based on the lack of an agreement, those facts which only could be used to establish an agreement were foreclosed. Other facts which merely may have supported a conspiracy theory, such as joint action, were not foreclosed.

In sum, we find that no errors were made at Smith's retrial based on the application of collateral estoppel. Further, we are confident that the trial court will continue to preside over this matter, at Tolbert's retrial, in the same careful and learned manner exhibited thus far. While the application of collateral estoppel is difficult, the trial court has shown that it can be accomplished equitably in even the most complex cases.

214

With the collateral estoppel issue decided, resolution of appellants' other common issue follows easily. Appellants insist that their acquittal on conspiracy precludes the Commonwealth from going forward on the third degree murder charge under a theory of accomplice liability. Appellants offer the following legal basis for their position:

All such theories, principal/accomplice or coconspirator, require as an element the existence of shared criminal intent. . . . [F]or the jury to have returned a verdict of not guilty of conspiracy to commit homicide, it had to conclude that there was a complete absence of any shared criminal intent. The issue of shared criminal intent having been litigated in [appellants'] favor precluded the Commonwealth from relitigating the issue on an accomplice liability theory. . . . .

Brief of Appellant Smith at 25–26.

 Appellants are simply wrong in asserting that an acquittal of conspiracy established that the jury concluded there was a "complete absence of shared criminal intent." As our previous discussion makes clear, proof that a person engaged in criminal activity with another does not necessarily establish conspiracy. *See Commonwealth v. Smith, supra*, 414 Pa.Super. at 214–16, 606 A.2d at 943. Rejection of a conspiracy theory does not eliminate the possibility of concerted action in the perpetration of a crime. A conspirator agrees with another to commit a crime and makes an overt act in furtherance thereof. The inchoate crime of conspiracy is thus committed regardless of whether the substantive crime occurs. An accomplice knowingly or voluntarily cooperates with or aids another in the commission of a crime. *Commonwealth v. Manchas*, 430 Pa.Super. 63, 633 A.2d 618, 627 (1993), *allocatur denied*, 539 Pa. 647, 651 A.2d 535 (1994). The aid rendered makes that person guilty of the substantive offense.

 Despite the similarities between conspiratorial culpability and accomplice liability, a jury verdict concluding that an

individual is not a conspirator does not require a concomitant conclusion that the same individual is not an accomplice.[18]

Appellants' argument on this issue fails; the Commonwealth is entitled to proceed on accomplice liability notwithstanding appellants' previous acquittals of conspiracy.

■ Smith presents two additional issues on appeal. First, he argues that the evidence presented at his initial trial was insufficient to establish a conviction for third degree murder. After the first jury was deadlocked on the third degree murder count, Smith filed a motion for acquittal alleging insufficient evidence. That motion was denied by the trial court. On appeal to this court, Smith argued only that retrial was barred by collateral estoppel. This court disagreed, our supreme court refused to hear the case and the matter was remanded for trial. Now that he has been found guilty, appellant seeks appellate relief on the basis of insufficiency at the *first trial.* We cannot grant such relief here. Our task is to evaluate the procedure and substance of the second trial. Any complaints Smith had with respect to the first trial should have been raised in his appeal in that case.

Smith also claims that the trial court should not have permitted Thomas Volinski, a Commonwealth witness, to identify him in court. Smith filed a motion to suppress Volinski's identification at the second trial because Volinski had misidentified him at the first trial.[19]

18. In *Commonwealth v. Boykin,* 276 Pa.Super. 56, 419 A.2d 92 (1980), *reversed on other grounds,* 501 Pa. 250, 460 A.2d 1101 (1983), this court addressed the very issue, stating:

> The jury in [the previous] trial could have reasonably found that despite the absence of an agreement, the appellant's actions aided his co-defendant's in their criminal activity. Therefore, the partial overlap in the statutory definitions of conspiracy and accomplice liability does not preclude a prosecution for the latter after an acquittal for the former.

*Id.* at 60, 419 A.2d at 94.

19. When asked to point to the individual who he had seen in the parking lot and who had approached him and Bastian, Volinski motioned to one of the defense attorneys.

We see no reason to engage in a lengthy analysis of this issue. Volinski testified that he saw three people beating Maldonado in the parking lot and observed Smith when Smith spoke with Bastian. Volinski's testimony was merely cumulative of at least four other Commonwealth witnesses who said they saw more than one person beating Maldonado. Further, Smith admitted that he approached Volinski and Bastian in the parking lot and engaged in conversation with Bastian. Even assuming Volinski's identification was flawed, any error in admitting it could not have contributed to the verdict and was clearly harmless. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

Judgment of sentence in appellant Smith's case affirmed. Collateral order of the trial court in appellant Tolbert's case affirmed; matter remanded for retrial in a manner consistent with this opinion. Jurisdiction in both cases relinquished.