

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2008

# Bond v. Beard

Precedential or Non-Precedential: Precedential

Docket No. 06-9002

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Bond v. Beard" (2008). *2008 Decisions.* Paper 582.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/582

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 06-9002 & 06-9003

JESSE BOND

Appellant (No. 06-9002)

v.

JEFFREY BEARD; WILLIAM STICKMAN;
JOSEPH MAZURKIEWICZ;
THE DISTRICT ATTORNEY OF THE
COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA

Appellant (No. 06-9003)

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 02-cv-08592)
District Judge: Honorable John P. Fullam

Argued April 8, 2008

Before: AMBRO, SMITH and ALDISERT, Circuit Judges

(Opinion filed August 20, 2008)

Maureen Kearney Rowley
    Chief Federal Defender
Michael Wiseman (Argued)
    Assistant Federal Defender
Stuart Lev

Assistant Federal Defender
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA   19106-0000

    Counsel for Jesse Bond

Thomas W. Dolgenos (Argued)
   Chief, Federal Litigation
Helen T. Kane
   Assistant District Attorney
Ronald Eisenberg
   Deputy District Attorney, Law Division
Arnold H. Gordon
   First Assistant District Attorney
Lynne Abraham
   District Attorney
Three South Penn Square
Philadelphia, PA   19107-3499

    Counsel for Jeffrey Beard, et al.

---

OPINION OF THE COURT

---

Table of Contents

I.     Background and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . .  4

II.    Jurisdiction and Standard of Review. . . . . . . . . . . . . . . . . . . . . . . .  5

III.   Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     A.     Bond's Appeal of the Denial of his Petition to Vacate his Conviction. . .  6

         1.    *Batson* Claim. . . . . . . . . . . . . . . . . . . . . . . . . . .  6

             a.    The *Batson* Standard. . . . . . . . . . . . . . . . . . . .  7

             b.    Standard of Review for *Habeas* Petitions . . . . . . . . . .  8

                (i)    Relevant Background. . . . . . . . . . . . . . . . .  8

|   |   | (ii) | Whether State Courts Reached Third Step of *Batson* Analysis.. . . . . . . . . . . . . . . . . . . . | 14 |
|   | c. |   | Analysis of *Batson* Claim.. . . . . . . . . . . . . . . . . | 15 |
|   |   | (i) | Evidence Presented to the State Courts. . . . . . . | 15 |
|   |   |   | (A) Disproportionate Strikes. . . . . . . . . . . | 15 |
|   |   |   | (B) Disparate Questioning. . . . . . . . . . . | 16 |
|   |   |   | (C) Pretextual Strikes.. . . . . . . . . . . . . . | 17 |
|   |   | (ii) | Evidence Presented to the District Court. . . . . . | 20 |
|   |   |   | (A) Evidence Considered by the District Court.. . . . . . . . . . . . . . | 20 |
|   |   |   | (B) Evidence Not Considered by the District Court. . . . . . . . . . . . . . | 22 |
|   | 2. | *Bruton* Claim.. . . . . . . . . . . . . . . . . . . . . . . . | 23 |
|   | 3. | Jury-Instruction Claims. . . . . . . . . . . . . . . . . . | 26 |
|   |   | a. Reasonable Doubt.. . . . . . . . . . . . . . . . . | 26 |
|   |   | b. Accomplice Liability. . . . . . . . . . . . . . . | 28 |
| B. | The Commonwealth's Appeal of the Vacation of Bond's Death Sentence. . . . . . . . . . . . . . . . . . . . . . . | 28 |
|   | 1. | Background of the Ineffective Assistance of Counsel Claim. . . . | 29 |
|   |   | a. The Penalty Phase Hearing. . . . . . . . . . . . . . | 29 |
|   |   |   | (i) Mitigation Testimony. . . . . . . . . . . . . | 29 |
|   |   |   | (ii) Penalty Phase Argument.. . . . . . . . . . . | 30 |
|   |   | b. The PCRA Hearing. . . . . . . . . . . . . . . . . | 31 |
|   |   | c. The Pennsylvania Courts' Conclusion. . . . . . . . . . | 37 |
|   |   | d. Proceedings in the District Court. . . . . . . . . . . | 37 |
|   | 2. | Governing Law.. . . . . . . . . . . . . . . . . . . . . . | 38 |
|   | 3. | Analysis of Bond's Ineffective Assistance of Counsel Claim. . . . | 41 |
|   |   | a. Deficient Performance. . . . . . . . . . . . . . . . | 41 |
|   |   | b. Prejudice. . . . . . . . . . . . . . . . . . . . . | 43 |
| IV. | Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48 |

AMBRO, <u>Circuit Judge</u>:

Jai Ho Lee died in October 1991 after being shot during the robbery of the Stop and Go Deli in Philadelphia that he managed. A Philadelphia County jury convicted Jesse Bond of Lee's first-degree murder in February 1993. It returned a verdict of death and the court imposed that sentence.

Bond exhausted his state court remedies before filing a petition for *habeas corpus* in

the United States District Court for the Eastern District of Pennsylvania. The District Court rejected Bond's challenges to his conviction. It granted the petition as to his death sentence, however, as it concluded that Bond had received ineffective assistance of counsel at the penalty hearing. Bond and the Commonwealth cross-appealed. We affirm the judgment of the District Court in all respects.

## I.    Background and Procedural History

The Commonwealth prosecuted Bond for shooting Lee when he refused to open the cash register. It prosecuted Aaron Wheeler at the same trial for serving as Bond's lookout.[1] The Commonwealth presented extensive evidence of Bond's guilt. Yang-Jin Kim, an employee at the Stop and Go Deli who witnessed the entire robbery and shooting from close range, identified Bond as the shooter. The prosecution presented confessions by both defendants that had been redacted to eliminate references to the other defendant by name (although Bond challenged his confession on the basis that it had been coerced and testified that he was not involved in the robbery). Beulah Sheppard also told police that she saw Bond shoot Lee, though she claimed at trial she had lied to the police.

The jury found Bond guilty of first-degree murder, robbery, criminal conspiracy, and possession of an instrument of crime. The penalty phase began the next day. The Commonwealth presented evidence in support of the aggravating circumstance that Bond murdered Lee while committing another felony. It also presented evidence of Bond's criminal history, and specifically his conviction for the robbery and murder of a restaurant owner ten days prior to the murder of Lee.[2] Bond attempted to establish mitigating factors by presenting evidence of his good character and his youth. The jury found three aggravating circumstances and no mitigating circumstances.[3] It returned a verdict of death.

---

[1]The jury found Wheeler guilty of second-degree murder, robbery, criminal conspiracy, and possession of an instrument of crime. He was sentenced to a mandatory term of life imprisonment.

[2]Bond avoided the introduction of testimony regarding a third robbery and (non-fatal) shooting because of the timing of the respective trials.

[3]The three aggravating factors were committing a murder in the course of committing a felony, *see* 42 Pa. Cons. Stat. § 9711(d)(6), a significant history of felony convictions involving the use or threat of violence to the person, *see id.* § 9711(d)(9), and a prior

4

The trial judge denied post-verdict motions and Bond appealed to the Pennsylvania Supreme Court, which affirmed. *See Commonwealth v. Bond*, 652 A.2d 308 (Pa. 1995). Bond filed a petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Con. Stat. § 9541 *et seq.*[4] The trial judge (now sitting as the PCRA court) held a seven-day hearing on Bond's PCRA claims before denying them all. The Pennsylvania Supreme Court affirmed. *See Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002).

Bond subsequently filed a petition for *habeas corpus* in the District Court. The Court held an evidentiary hearing regarding Bond's claims, including those of jury discrimination and ineffective assistance of counsel at the penalty phase. It denied each of Bond's guilt-phase claims but vacated the death sentence after granting Bond's petition as to the penalty phase ineffective assistance of counsel claim.

The Commonwealth appeals the grant of penalty phase *habeas* relief. Bond appeals the District Court's denial of his guilt-phase claims.[5]

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 2241, 2254. We have jurisdiction over this appeal under 28 U.S.C. §§ 1291, 2253.

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits *habeas* relief on issues that state courts have decided on the merits. AEDPA bars *habeas* relief unless the state court decision is contrary to or an unreasonable application of clearly established Supreme Court law, or the state court decision involves an unreasonable

conviction for murder, *see id.* § 9711(d)(11).

[4]New counsel replaced trial counsel at this stage in the proceedings.

[5]The District Court issued a certificate of appealability as to each of the guilt-phase claims.

We previously denied Bond's request for certificates of appealability regarding the two other sets of crimes he committed shortly before Lee's murder. *See* Order Denying Request for Certificate of Appealability, *Bond v. Blaine*, Case No. 06–2886 (3d Cir. Dec. 20, 2006) (relating to the robbery and non-capital murder of a restaurant owner); Order Denying Request for Certificate of Appealability, *Bond v. Stickman*, Case No. 06–2656 (3d Cir. Dec. 20, 2006) (relating to the robbery and assault of a restaurant owner).

determination of the facts. 28 U.S.C. § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). We may not "grant *habeas corpus* relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000). The state court's application of Supreme Court precedent must have been objectively unreasonable; "[t]he federal *habeas* court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Hackett v. Price*, 381 F.3d 281, 287 (3d Cir. 2004) (internal quotation marks omitted).[6] A state court's factual findings are "presumed to be correct," and the *habeas* petitioner carries the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Chadwick v. Janecka*, 312 F.3d 597, 607 (3d Cir. 2002). We review *de novo* issues that the state court did not decide on the merits. *Everett v. Beard*, 290 F.3d 500, 508 (3d Cir. 2002).

## III. Discussion

### A. Bond's Appeal of the Denial of his Petition to Vacate his Conviction

Bond argues that the District Court erred in denying three of his guilt-phase claims. We conclude that each argument fails.

#### 1. *Batson* Claim

Bond, who is black, contends that the prosecutor used peremptory strikes in a racially discriminatory manner during jury selection. He argues that this violates the Equal Protection Clause as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court rejected each of the three *Batson* challenges made by defense counsel, resulting in the seating of a jury consisting of eight white and four black members.[7] The state courts rejected Bond's *Batson* claim on direct appeal and in post-conviction proceedings. The District Court

---

[6] This language comes initially from *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir. 1999) (en banc). We note that any disagreement on this point among the majority and concurring opinions in *Matteo* is not dispositive here.

[7] The Commonwealth speculates that the deliberating jury may have included 5 black members because one alternate was called into service. The record is inconclusive as to this contention.

deferred to the state courts under the AEDPA standard.  We affirm.

> a.        The *Batson* Standard

*Batson* requires a three-step analysis, which the Supreme Court has articulated as follows:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible"; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (citations omitted).

The parties do not dispute that Bond made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race or that the prosecutor gave a race-neutral explanation for the challenge.  The dispute thus turns on whether Bond carries his burden of proving purposeful discrimination.  The burden at this step three is to show that it is more likely than not that the prosecutor struck at least one juror because of race.  *See Wilson v. Beard*, 426 F.3d 653, 670 (3d Cir. 2005).  At step three, "the trial judge must make a finding regarding the [prosecutor's] motivation." *Bronshtein v. Horn*, 404 F.3d 700, 723 (3d Cir. 2005).

7

### b.    Standard of Review for *Habeas* Petitions

We first address the threshold question of whether to apply the deferential AEDPA standard of review.  The Commonwealth would have us answer that question "yes."  Bond disagrees and asks us to apply a *de novo* standard of review.  Their dispute centers on whether the state courts reached the third part of the *Batson* analysis and resolved it on the merits.  If the state courts performed a step-three analysis and made a finding about the prosecutor's intent, that finding is presumed correct, *see* 28 U.S.C. § 2254(e)(1), and Bond is entitled to relief only if (1) the state court decision was "contrary to," or involved an "unreasonable application" of, Supreme Court precedent, *id.* § 2254(d)(1); or (2) the finding was unreasonable in light of the record before the state court, *id.* § 2254(d)(2); or (3) Bond rebutted that finding with clear and convincing evidence in the District Court, *id.* § 2254(e)(1).  Failure to make a step-three finding, on the other hand, would render the state court's decision either "contrary to" or an "unreasonable application" of *Batson*, *see, e.g.*, *Hardcastle v. Horn*, 368 F.3d 246, 259 (3d Cir. 2004), and we would not apply AEDPA deference.  We would review the issue *de novo* with the exception that we would review relevant factual findings made by the District Court for clear error.  *See Whitney v. Horn*, 280 F.3d 240, 249 (3d Cir. 2002).

### (i)    Relevant Background

The issue of race first arose at *voir dire* when the prosecutor complained about defense counsel's strikes of white venirepersons.  The trial court rejected the prosecutor's complaint, noting instead that it was concerned about his (the prosecutor's) actions because he had stricken four of the five black venirepersons he had an opportunity to accept.

Defense counsel raised their first *Batson* challenge after the prosecutor struck the next black member of the jury pool.  The court noted that the prosecutor had stricken five of six black venirepersons, but only three of their 15 white counterparts, and that "there's clearly a propensity on the Commonwealth to strike black jurors."  At defense counsel's urging, the court asked the prosecutor to state his reasons for striking two of the black venirepersons (Kim Clark and Geraldine McLendon).

When the prosecutor asked if the court was ordering him to do so and finding a *prima facie* case, the court said, "I'm not sure what I'm going to do at this point. . . .  I don't start out discussing anybody's motives, but I think it's a reasonable request.  Maybe you ought to

tell me that, and we'll take it from there." The prosecutor stated, with respect to Clark, that she "did not want to be here. . . . She did not seem very enthusiastic about the proceedings and merely did not want to be here. I did not like the way she related to me. Two of the white jurors I struck had the same problem. . . . I did not like the way that they came off to me. That was the reason I struck her." Turning to McLendon, the prosecutor claimed she "equivocated as far as the death penalty was concerned. I was not completely confident with her answer. She said, [']if necessary.[']" Defense counsel then asked the court to seat McLendon, arguing that she was "a lot more solid a citizen than the lady that we seated a month and a half ago [during Bond's first trial]. . . . It just would seem to be no neutral reason for striking Miss McLendon." The prosecutor argued that McLendon was similar to a white venire-person he had stricken. The court said:

> I understand that. Except you've struck five out of six blacks when you've had the opportunity to, and you have struck – you only preempted three out of 15 whites. I'm not at this point going to find that [the prosecutor] is using his peremptory challenges to exclude black jurors, and I am not going to find at this time that it is racially motivated. However, . . . I'm highly conscious of my responsibility in that regard, and that's all it is. I do want to follow the appellate court cases. . . . And right now, with all respect to you, [the prosecutor], I think if we're close in any area, it's in the circumstances of the Commonwealth's exercise. I'm not finding at this point any *prima facie* case. So, we'll proceed.

The next day, after the prosecutor struck five more black venirepersons, defense counsel raised their second *Batson* challenge. It pertained to three members of the venire (Brian Reed, William Williams and Nicole Gilyard). The court noted that the prosecutor had accepted two black venirepersons, who were selected, and a third, who was stricken by the defense, but had stricken nine of the 13 black venirepersons whom he had an opportunity to accept. Defense counsel contended that a pattern had been established, prompting the court to want to hear from the prosecutor.

The prosecutor called the choice to strike Reed "obvious" in light of Reed's apparent concerns about imposing the death penalty. The court agreed, saying "I think that's clear." The prosecutor stated that he had stricken Williams because, although otherwise "ideal," he

"gave me shock" when he "equivocated" about the death penalty. Finally, with respect to Gilyard, the prosecutor noted that he was "very concerned with the nature of the close relationship she had with the person accused of a robbery. . . . The fact that she seemed to have a close relationship, saw a person every day who committed a robbery, that really turned me off and that's why I didn't want her." The prosecutor then volunteered that he thought Gilyard different from a white juror he accepted who had testified as a character witness on behalf of a co-worker accused of manslaughter. He said: "I just thought that he was a co-worker and did not have the close relationship with this individual had with the person who was accused of robbery." The trial court said "I presume you're saying . . . that their race played no part in your –," to which the prosecutor responded "[n]one whatsoever."

Bond's counsel rejoined that the aforementioned white juror also "was questionable" about whether he could impose the death penalty, and thus "the same reasons the Commonwealth is using to strike people he seems to avoid when it's a white potential juror." The court then said: "I'm not going to try and get into [the prosecutor's] mind, and I don't think it's appropriate really for you to. What I need from him is some objective statement that's racially neutral. . . . I'm satisfied that he has given it at this juncture."

The court then heard from counsel for Bond's co-defendant, who joined in Bond's counsel's argument and added that "assuming we get to the establishment of a pattern, one of the three criteria the Commonwealth must meet to overcome that presumed or assumed pattern is that the reason they give is racially neutral and that there is a basis for them and they are not just made up out of whole cloth. . . ." Co-defendant's counsel also argued that it was inconsistent for the prosecutor to strike a black venireperson because she knew an accused robber but accept a white venireperson who testified on behalf of a co-worker accused of manslaughter: "[T]hat flies in the very face of the reasons given. . . . And I think there you have a fabricated reason by the Commonwealth. There they have failed to give a racially neutral reason, and in so failing, I would say that the redress . . . is to seat that juror."

The prosecutor replied by reiterating his argument that the white venireperson's relationship with a criminal defendant did not seem to him as close as the black venireperson's comparable relationship, and also that the white juror had not equivocated regarding the death penalty. The trial court ruled:

> Okay. I am satisfied that the explanation is racially neutral. I do
> find *prima facie* – by the exercise of its peremptory challenges

10

as set forth, that there is some *prima facie* evidence of the Commonwealth striking black jurors because of race. And I'm satisfied at this point that no further action is warranted. . . . But in any event, I am satisfied that [the prosecutor's strike of Gilyard] prevails and we should move on to the next juror.

*Voir dire* proceeded. After the prosecutor struck another black venireperson, Joyce Hinton, defense counsel (prompted by the court) raised their third and final *Batson* challenge. The court said: "I have already found that a *prima facie* case does exist of a pattern used by the Commonwealth to exclude jurors because of race. And I'll permit [the prosecutor] to explain this particular instance." The following then transpired:

THE PROSECUTOR: Judge, I was all set to accept this juror, except I asked the witness when she hesitated, clearly hesitated about the death penalty.

THE COURT: She didn't hesitate one bit, in this Court's opinion.

THE PROSECUTOR: In my opinion, she most –

THE COURT: Okay. I understand that. In other words, she was asked that question by [counsel for the co-defendant]. She was asked it by you. And then you asked what you always ask, ["A]re you sure?["]

The prosecutor argued in support of asking witnesses whether they are "sure" about the death penalty, but the trial court ordered him to refrain from doing so. The following then transpired:

THE COURT: You've indicated that you think this juror has hesitated on the death penalty issue and that's why you exercised your peremptory challenge.

THE PROSECUTOR: No, that is not why I exercised it.

11

THE COURT:          Well, why did you?

THE PROSECUTOR      She resented my asking, ["A]re you sure[?"] She's the first witness of this entire two days who took offense when I asked the question. I did not mean to offend her, but that's the ultimate question in this case.

THE COURT:          All right. You don't have to say any more. I'm satisfied that the explanation is racially neutral. I'm not saying that I necessarily agree with it except to the extent that there was something that occurred at the end of that questioning that could have made counsel hesitate over this precise juror and the manner in which that question was asked and responded to. Accordingly, I continue my finding that the Commonwealth is indeed – that there is indeed a *prima facie* case of excluding jurors because of race, but I'm satisfied at this point that that's racially neutral. And I'll permit the strike. You may call the next juror.

The trial court revisited the *Batson* issues on post-trial motions. It held:

> *Batson* was first raised here by defendant Bond after the Commonwealth had struck nine out [of] a possible thirteen black jurors. The court then found that this pattern established a prima facie case that the Commonwealth was using its peremptory challenges to remove black jurors and asked that the Commonwealth explain its reasons for challenging black jurors. At the defendant's request the Commonwealth explained its reasons for striking three black jurors. . . . The court found these reasons to be racially neutral and permitted the three strikes. After being challenged a second time the prosecutor explained his tenth strike. . . . Here too the court found the reason to be racially neutral. The jury after completion of the

12

selection process consisted of four black people, out of a possible fourteen, and eight white people. Reviewing the totality of the circumstances[,] there is no showing of intentional discrimination by the prosecutor in the jury selection process and defendants are not entitled to a new trial on that basis.

Opinion Denying Post-Trial Motions at 6–7, Case Nos. 1783–1791, 1821-1828 (Ct. C.P., Philadelphia County, Oct. 5, 1993) ("Post-Trial Motions Opinion").

The Pennsylvania Supreme Court reviewed Bond's *Batson* challenges on direct appeal. It wrote:

When each of the explanations as set forth above was offered by the prosecutor, the trial judge, who was present throughout the entire voir dire, accepted the explanations as legitimate and race neutral. Appellant does not now offer any specific arguments as to why a particular explanation was not acceptable. Rather, appellant makes a generalized assertion that the reasons put forth by the Commonwealth were not racially neutral. Based upon our review of the record we find no reason to disturb the findings of the trial court as to the legitimacy of the race neutral responses offered in this case.

*Commonwealth v. Bond*, 652 A.2d 308, 310–11 (Pa. 1995).

The PCRA court refused to consider a newly discovered videotape of a veteran prosecutor explaining how to get around *Batson* to younger attorneys in the office that prosecuted Bond. It summarized its previous *Batson* ruling as follows: "[F]ollowing a *Batson* challenge during jury selection, this court found no racial basis for the peremptory challenges by the prosecutor, a finding which was affirmed by the Pennsylvania Supreme Court." Opinion Denying Petition for Post-Conviction Relief at 3–4, *Commonwealth v. Bond*, Case No. 1783, 1/2 (Ct. C.P. Philadelphia County, Jan. 26, 1998) ("PCRA Opinion"). The Pennsylvania Supreme Court affirmed. It characterized its prior *Batson* ruling as follows: "On direct appeal, this Court held that the prosecutor had articulated race-neutral reasons for the use of peremptory challenges." *Bond*, 819 A.2d at 48 n.8.

13

(ii) Whether State Courts Reached Third Step of *Batson* Analysis

The state courts repeatedly failed to identify the three steps of the *Batson* analysis explicitly. This renders our task harder on review, as we must attempt to discern whether those courts did in fact perform each step.

The record certainly gives serious cause for concern that the state courts did not reach the third step of the *Batson* analysis. Most troubling, the trial court stated that it was "not going to try and get into [the prosecutor's] mind" and suggested that it only needed "some objective statement that's racially neutral." This seems to indicate that the trial court believed that it could stop after the prosecutor satisfied the second step of the *Batson* analysis by stating a race-neutral explanation for a strike. The *voir dire* transcript never explicitly clarifies whether, in accepting explanations to be race-neutral, the trial court or the Pennsylvania Supreme Court believed that the prosecutor truly had acted in a race-neutral fashion (satisfying step three of the *Batson* analysis), or merely that the stated explanations were race-neutral (at step two).

Having reviewed the state court record closely, however, we conclude that the trial court and the Supreme Court both reached the third step of the *Batson* analysis and resolved it in favor of the Commonwealth. The trial court may have stated its resolution of the *Batson* analysis inartfully during *voir dire*, but its order denying post-trial motions shows that it reached *Batson*'s third step. It wrote: "Reviewing the totality of the circumstances there is no showing of intentional discrimination by the prosecutor in the jury selection process and defendants are not entitled to a new trial on that basis." Post-Trial Motions Opinion at 7. The reference to a "showing of intentional discrimination" puts this conclusion within step three of the *Batson* analysis. Here, the trial court does more than conclude that the prosecutor offered a race-neutral explanation for a strike; it concludes that Bond did not meet his burden of showing that purposeful racial discrimination, not the proffered explanation, actually motivated the prosecutor's conduct. This step-three conclusion indicates that the trial court indeed did understand the steps of a *Batson* analysis.

The Pennsylvania Supreme Court essentially incorporated the reasoning of the trial court, although it did not make specific mention of the opinion denying the post-trial motions. It described the trial court as accepting the prosecutor's explanations as "legitimate and race neutral," and referred to the trial court's findings "as to the legitimacy of the race neutral responses offered in this case." The emphasis on legitimacy demonstrates that the

14

Supreme Court considered the third step of the *Batson* analysis. Had it stopped at the second step, it merely would have inquired into the existence of "race neutral" explanations or responses. But it also described the legitimacy of those "race neutral" explanations. It considered, in other words, whether the prosecutor had told the truth when he offered race-neutral explanations. It concluded that he had done so. This amounts to a determination on the merits at the third step of the *Batson* analysis. We therefore apply the deferential AEDPA standard of review. *Cf. Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007) (explaining that AEDPA deference applies to implicit as well as explicit factual findings).

c.        Analysis of *Batson* Claim

(i)        Evidence Presented to the State Courts

Bond argues that the *voir dire* transcript shows that: (A) the prosecutor struck black venirepersons and accepted white venirepersons disproportionately; (B) the prosecutor asked black venirepersons more, and different kinds of, questions than white venirepersons; and (C) the prosecutor's stated reasons for striking certain black venirepersons were inconsistent with his acceptance of certain white venirepersons or otherwise appear pretextual. The Supreme Court has recognized that these factors are relevant on the issue of discriminatory intent. *See Miller-El v. Dretke*, 545 U.S. 231, 240–63 (2005).

(A)        Disproportionate Strikes

The trial court conducted two days of *voir dire*. Each panel included forty venirepersons. The *voir dire* transcript and case record do not show conclusively the race of many of these individuals. They do reveal the following, however: (1) the jury consisted of eight white and four black members, with two black alternates;[8] (2) the venire panel on day one included 10 black and 30 non-black venirepersons; and (3) the prosecutor used 11 of his peremptory strikes against black venirepersons, 3 against white venirepersons, and one against an hispanic venireperson.

These raw statistics do not provide a clear picture of intentional racial discrimination. The higher number of strikes against black venirepersons raises concern but, as the

_____

[8]The Pennsylvania Supreme Court concluded on direct appeal that the two alternates were black. Bond has not challenged that finding.

Commonwealth notes, black jurors ultimately formed a larger percentage (33%) of the jury than they did of the only venire panel whose racial composition we know (25%). This comparison becomes even more favorable for the Commonwealth when we add the alternates to our consideration (43% versus 25%).

The parties dispute the number of black venirepersons that the prosecutor had the opportunity to strike. Bond believes this number to be 15, the Commonwealth 17. It appears that the prosecutor accepted at least seven of these venirepersons (the four black jurors, the two black alternates, and one black venireperson struck by the defense). This means that the prosecutor accepted somewhere between 41% (7 of 17) and 47% (7 of 15) black venirepersons that he had the opportunity to strike. Bond contends that this compares unfavorably to the Commonwealth's acceptance of white venirepersons, which it characterizes as an 83% rate. Assuming this to be correct, we certainly recognize the disparity between that rate and the 41%–47% rate for black venirepersons. This raises an inference of intentional racial discrimination. That inference does not have much strength, however, in light of the ultimate number of black jurors (and alternates), and the reasonably high rate of accepting black venirepersons. Both factors distinguish this case from *Miller-El*. *See* 545 U.S. at 240–41 (noting that the prosecutor accepted only 9% of the black venirepersons he had an opportunity to accept and that, while approximately 20% of the venirepersons were black, only one of 108 black venirepersons actually served on the jury).

(B)     Disparate Questioning

Bond's argument regarding the disparate questioning of venirepersons suffers from the threshold problem that we do not know the race of each of the venirepersons. Bond thus cannot provide a detailed analysis of the questions posed to the venire pool as a whole. He relies on comparisons between stricken black venirepersons and seated white jurors, both for the substance of questioning and the number of questions posed. He does not explain why other factors, such as job stability or roots in the community, could not account for these differences. That five black stricken venirepersons were asked whether they were "sure" they could impose the death penalty raises an inference of intentional discrimination. But that inference is not particularly strong, as even Bond concedes that the Commonwealth posed the question to at least two non-black venirepersons. Nothing identified by Bond provides a close comparison to *Miller-El*. In that case, 6% of white venirepersons, compared to 53% of black venirepersons, were given a graphic description of the death penalty during questioning, *id.* at 255, and 100% of black venirepersons, compared to 27% of white

venirepersons, were asked a trick question about imposing the death penalty, *id.* at 262. No equivalent difference in questioning occurred in this case.

(C)     Pretexual Strikes

Bond contends that the prosecutor gave pretextual reasons for striking four specific black venirepersons: Kim Clark, Geraldine McLendon, Nicole Gilyard, and Joyce Hinton.

To repeat, the prosecutor stated that he struck Clark because she did not seem enthusiastic about the proceedings and did not want to be there. Bond argues that the record does not support this subjective reason. We agree with the Commonwealth, however, that the record is unlikely to indicate lack of enthusiasm or other such moods that the prosecutor may claim to discern. The trial court did not note any disagreement with the prosecutor's stated reason and Bond has not identified any white jurors accepted by the prosecutor despite a similar lack of enthusiasm. The prosecutor's strike of Clark thus provides little, if any, support for Bond's position.

Similar defects weaken Bond's argument regarding McLendon. The prosecutor stated that he struck her because she equivocated about her ability to impose the death penalty. Bond responds that the record reveals no such hesitation. The record is unlikely to reveal such pauses, however, and the trial court did not dispute the prosecutor's allegation of hesitation (as compared to its rejection, discussed below, of any suggestion that Hinton hesitated). Bond also argues that the prosecutor contradicted his professed preference for jurors with children and stable work histories in striking McLendon (who met both preferences). Bond fails, however, to identify an accepted white venireperson with a similar background.

The prosecutor stated that he struck Gilyard because he was "very concerned with the nature of the close relationship she had with the person accused of a robbery. . . . The fact that she seemed to have a very close relationship, saw a person every day who committed a robbery, that really turned me off and that's why I didn't want her." Bond first argues that the record does not support the existence of a close relationship between Gilyard and the robbery defendant. We agree that the prosecutor may have exaggerated describing this relationship as "very close," but the record does show that the prosecutor reasonably could have believed that a close relationship existed between Gilyard and the robbery defendant: Gilyard identified the accused person as someone "close to" her and a friend whom she saw

17

"practically every day."

Bond argues that two white jurors, Thomas Dunst and Mary Wetzel, also had a close relationship with individuals accused of a crime. The trial court did not hear argument regarding Wetzel, so we do not have available for review any explanation by the prosecutor on that point. Dunst had testified that a co-worker had been accused of manslaughter and that he testified as a character witness on his behalf. The prosecutor stated that he did not strike Dunst because he was only a co-worker of the manslaughter defendant. This explanation is not inherently implausible and the subtle distinction identified by the prosecutor may reflect a legitimate, reasonable, non-race-based trial strategy. Even so, the failure to strike Dunst does raise concerns that the prosecutor gave pretextual reasons for striking Gilyard. The trial court did not express concerns about that strike, however, and accepted the prosecutor's explanation. Nothing in the record indicates that it was unreasonable to do so. Our review of the record also reveals that the trial court likely would have perceived no significant additional grounds for concern had Bond also pointed to the failure to strike Wetzel. That conclusion would have been reasonable. We thus conclude that the strike of Gilyard permits an inference of discriminatory intent, but that it is not a strong one.

The trial court did express concern about the strike of Hinton. The following exchange (which we also quote in full above) occurred:

THE PROSECUTOR: Judge, I was all set to accept this juror, except I asked the witness when she hesitated, clearly hesitated about the death penalty.

THE COURT: She didn't hesitate one bit, in this Court's opinion. . . . You've indicated that you think this juror has hesitated on the death penalty issue and that's why you exercised your peremptory challenge.

THE PROSECUTOR: No, that is not why I exercised it.

THE COURT: Well, why did you?

18

THE PROSECUTOR: She resented my asking, are you sure. She's the first witness of this entire two days who took offense when I asked the question. I did not mean to offend her, but that's the ultimate question in this case.

THE COURT: All right. You don't have to say any more. I'm satisfied that the explanation is racially neutral. I'm not saying that I necessarily agree with it except to the extent that there was something that occurred at the end of that questioning that could have made counsel hesitate over this precise juror and the manner in which that question was asked and responded to. Accordingly, I continue my finding that the Commonwealth is indeed – that there is indeed a *prima facie* case of excluding jurors because of race, but I'm satisfied at this point that that's racially neutral. And I'll permit the strike. You may call the next juror.

Bond contends that this exchange reveals a change in positions by the prosecutor in that he first stated that he struck Hinton for hesitating and then stated that he struck her for taking offense at his question. The Commonwealth contends, to the contrary, that the trial court interrupted a single explanation of the strike: that, after Hinton hesitated, the prosecutor asked a follow-up question, to which Hinton took offense. The ambiguous transcript supports both readings. It does not allow us to discern whether Hinton indeed did resent the asking of the follow-up question. Even if she did not hesitate, the trial court appears to have agreed that she resented that question. Any exaggeration about hesitation does not stop resentment of the prosecutor's question from being a legitimate basis for a strike. Were we to doubt that the prosecutor did in fact have that motive for striking Hinton, the record still would not allow us to do more than suspect improper motives. It does not make clear any unreasonableness in the trial court's acceptance of the prosecutor's stated reason.

\* \* \* \* \*

Taken as a whole, the *voir dire* transcript raises legitimate concerns that the prosecutor

19

struck black venirepersons disproportionately and gave pretextual reasons for doing so. We agree with the District Court's suggestion that reasonable minds could differ on the proper result of the third step of the *Batson* analysis with respect to the evidence before the state courts. That is not our inquiry, however. As discussed, we apply the deferential AEDPA standard. The possibility that we might have resolved this question differently had we sat as the trial court does not provide a basis for *habeas* relief under that standard. The trial court record does not allow us to conclude that the state court decisions were either "contrary to," or involved an "unreasonable application" of, Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), nor that the state courts' findings were unreasonable in light of the record before them, *see id.* § 2254(d)(2). We thus defer to the state courts' conclusion that Bond failed to meet his burden at the third stage of the *Batson* analysis on the record before the state courts.

### (ii)     Evidence Presented to the District Court

Bond also bases his *Batson* claim on evidence that he did not present to the state courts. We consider that evidence in two steps: first, evidence considered by the District Court, and second, evidence not considered by the District Court on procedural grounds.

### (A)     Evidence Considered by the District Court

The District Court held a hearing on two kinds of evidence that the Philadelphia District Attorney's Office had a policy of discrimination at the time of Bond's trial. Specifically, the court heard evidence that Assistant District Attorney Jack McMahon gave a videotaped training session explaining how to use race as a factor in jury selection, and that another Assistant District Attorney, Bruce Sagel, also trained members of the office to use race as a factor in selecting juries. The District Court concluded that this evidence did not indicate that the prosecutor in Bond's case struck venirepersons because of racially discriminatory intent.

The Commonwealth contends that the District Court should not have held a hearing as to these two types of evidence because the state courts concluded that a hearing was unnecessary as to the McMahon evidence and did not have the opportunity to review the Sagel evidence. This argument raises questions as to the propriety of the evidentiary hearing. Rather than decide those questions, however, we assume the best possible procedural posture for Bond: that we review the District Court's finding that the evidence was unpersuasive for

clear error.[9] *See Cristin v. Brennan*, 281 F.3d 404, 409 (3d Cir. 2002).  As discussed below, we conclude that Bond does not prevail even with the benefit of that assumption.

The Commonwealth does not attempt to defend the contents of the McMahon video. Instead, it argues that the District Court did not clearly err in concluding that the McMahon video did not show that the Philadelphia District Attorney's Office had a policy or culture of discrimination.  The Commonwealth first points to the testimony of the prosecutor in Bond's case.  He stated that he never saw the McMahon video, had not heard of it before it became public, had never had any discussions with McMahon, and had not been trained by him.  Bond's prosecutor also testified that no one had taught him to strike black jurors.  The Commonwealth also presented the testimony of other members of the District Attorney's Office.  They testified that: (1) the videotape represents McMahon's personal views, not those of the office; (2) the office policy was to follow the requirements of *Batson*; (3) only ten to fifteen assistant district attorneys actually attended the lecture seen in the videotape; and (4) while the videotape was available to new prosecutors, it was not part of a regular training program.

The District Court credited the prosecutor's testimony and, while acknowledging it to be a "reasonable inference" that such a policy existed, it "d[id] not conclude that it was the policy of the District Attorney's Office to discriminate on racial grounds in the process of selecting juries." *Bond v. Beard*, 2006 WL 1117862, at *3 (E.D. Pa. Apr. 24, 2006).

Bond's attempts to undermine that conclusion lack force.  His arguments remain general and do not have significant persuasive effect regarding his specific case.  Bond does not, for example, identify specific testimony that demonstrates that the prosecutor did not deserve the positive credibility finding made by the District Court.  That Court, which gave the matter much attention, had the opportunity to sit and listen to the prosecutor's testimony. We will not conclude that it committed clear error without some firmer indication of the prosecutor's lack of veracity than the general concerns voiced by Bond.  Nor do we perceive error in the District Court's reference to a  "policy of discrimination" rather than to a "culture of discrimination."  Any difference between those phrases is irrelevant here, since the District

---

[9]The Commonwealth does not suggest that we may not make this assumption.  It does not argue that the question of the propriety of an evidentiary hearing is jurisdictional or otherwise contend that we must address the procedural posture of this case rather than dispose of it on the merits.

Court implicitly found insufficient evidence of pervasive influence or pressure on prosecutors that pushed them toward *Batson* violations. The District Court concluded that the McMahon videotape had not affected the performance of the prosecutor in Bond's case. Even if, as Bond suggests, the District Court should have spoken in terms of the office's culture, rather than its policy, that would not change the Court's conclusion that Bond has not shown that the prosecutor had seen the videotape or otherwise been trained to avoid *Batson*.

The District Court also did not commit clear error in its treatment of the Sagel evidence. Bond's claim on that point referred to a magazine article based on handwritten notes taken by Assistant District Attorney Gavin Lentz in a training given by Sagel. Bond sought to establish the existence of a culture of discrimination through these notes. However, both Lentz and Sagel testified in the District Court that the lecture did not include instructions to strike venirepersons because of their race. Lentz also testified that he did *not* believe that there was a "pervasive culture of discrimination in the office[.]" Given this testimony that contradicts Bond's depiction of the Sagel training as equivalent to the McMahon lecture and that denies the existence of a culture of discrimination, the District Court did not clearly err in deciding that this "additional evidence," like the McMahon videotape, does not support a conclusion that the District Attorney's Office had a culture of discrimination.

(B)     Evidence Not Considered by the District Court

Bond also presented a statistical study to the District Court. He argues that this study, performed by Professors David Baldus and George Woodford, demonstrates that the Philadelphia District Attorney's Office struck black venirepersons at a 33% higher rate than non-black venirepersons. He asserts that it shows that Bond's prosecutor had stricken 55% of black venirepersons as opposed to 22% of non-black venirepersons. The District Court refused to consider this evidence because of Bond's failure to present it to the state courts.

We do not decide the question whether the District Court could have considered this evidence.[10] Even if introduced, this survey, considered either individually or as part of the

---

[10]As with our assumption regarding the permissibility of an evidentiary hearing, we may make this assumption because, even if viewed as incorporating procedural default and exhaustion claims, the Commonwealth is not making a jurisdictional argument. *See Sweger*

record as a whole, would not change our evaluation of the merits of this claim. As the District Court explained, Bond bears the ultimate burden of establishing that the prosecutor in his case intentionally discriminated on the basis of race when he struck venirepersons. The Baldus study permits an inference that the District Attorney's Office tends to strike black venirepersons more often than non-black venirepersons and that Bond's prosecutor has demonstrated a similar tendency. But each court to consider the prosecutor's conduct in this specific case has concluded that the prosecutor did not discriminate intentionally on the basis of race. Bond may not prevail on his *Batson* claim by relying on such general evidence as the survey when both state and federal courts have evaluated the prosecutor's specific motivations and found against Bond without making unreasonable factual determinations or committing clear error.[11]

* * * * *

Taken as a whole, or individually, the evidence not considered by the state courts does not cast meaningful doubt on their *Batson* decision. Bond has failed to rebut their conclusions by clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1), and has given us no reason to revisit our decision to defer to their *Batson* analysis. Accordingly, Bond's *Batson* claim fails.

### 2. *Bruton* Claim

The Sixth Amendment to the United States Constitution, and specifically its Confrontation Clause, guarantees criminal defendants the right to confront the witnesses against them. The Supreme Court has explained that a defendant is denied his right to confront witnesses against him when a prosecutor presents a co-defendant's confession

---

*v. Chesney*, 294 F.3d 506, 520 n.13 (3d Cir. 2002) (procedural default not jurisdictional); *Coady v. Vaughn*, 251 F.3d 480, 498 (3d Cir. 2001) (exhaustion not jurisdictional). Moreover, we likely could assume jurisdiction even if AEDPA's procedural bars arguably deprived us of jurisdiction. *See Bowers v. National Collegiate Athletic Ass'n*, 346 F.3d 402, 415–16 (3d Cir. 2003) (concluding that we must decide Article III jurisdictional issues prior to other issues, but that we may assume statutory basis of jurisdiction).

[11]This logic applies equally to Bond's suggestion that we discern discrimination in this case from the fact that federal and state courts found *Batson* violations in other prosecutions conducted by the Philadelphia District Attorney's Office.

implicating the defendant at a joint trial and the co-defendant does not testify. *See Bruton v. United States*, 391 U.S. 123 (1968).

The prosecutor sought to introduce confessions provided by both Bond and his co-defendant at their joint trial. Bond's counsel negotiated an appropriate approach given the constraints imposed by *Bruton*. They and the prosecutor apparently agreed that the Commonwealth would introduce a redacted version of Bond's co-defendant's confession. This version replaced Bond's name with the words "another guy" at the points where Wheeler implicated Bond in his confession.

The prosecutor unfortunately failed to keep to the parties' agreement. He used the term "the killer" instead of the words "another guy" in his opening and, at the end of that address to the jury, identified Bond by name: "He [Bond's co-defendant] . . . admits that he saw Bond shoot and kill Mr. Lee." Bond's counsel moved for a mistrial and severance. The trial court rejected that motion. It instead instructed the jury that opening statements do not constitute evidence and allowed the trial to proceed. The Pennsylvania Supreme Court upheld the trial court's decision on appeal and in post-conviction proceedings. It concluded that the redactions were sufficient and that the prosecutor's identification of Bond was harmless error in light of the trial court's instructions to the jury and the independent evidence of Bond's guilt.

The District Court applied the AEDPA standard of review. *See* 28 U.S.C. § 2254(d)(1)–(2). It held that the state courts did not apply governing law unreasonably in holding harmless any Confrontation Clause violation.

The Commonwealth does not contest the existence of error under the Confrontation Clause. It renews its argument, however, that any error was harmless. We thus turn to the same question posed to the District Court. But our analysis differs somewhat in light of *Fry v. Pliler*, 551 U.S. __, 127 S.Ct. 2321, 2328 (2007), which the Supreme Court issued after the District Court's opinion. *Fry* instructs us to perform our own harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), rather than review the state court's harmless error analysis under the AEDPA standard. *See Fry*, 127 S.Ct. at 2328.

The Supreme Court explained in *Brecht* that an error is harmless if it did not have "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Under this standard,

24

habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Id.* (quotation marks omitted). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quotation marks omitted).

We conclude here that the error was harmless under *Brecht*. The prosecutor's conduct raises serious questions as to his willingness to respect Bond's rights under the Confrontation Clause.[12] Yet, the Commonwealth presented such extensive evidence of Bond's guilt that the error could not have had a substantial and injurious effect or influence in determining the jury's verdict. Kim, who had an unobstructed view of the shooter during the robbery, identified Bond. He testified at trial that he was "absolutely certain" that Bond had shot Lee. Sheppard also gave detectives a statement before trial identifying Bond as the shooter (although she did retract that statement at trial). Finally, Bond himself confessed to the crime but contended at trial that the police had coerced this confession from him. Wheeler's confession added little to this compelling evidence against Bond, particularly since he provided an alibi defense and his counsel suggested in closing that Wheeler's confession had been coerced. The jury could have acquitted both defendants by crediting Wheeler's alibi and concluding that Bond and Sheppard told the truth on the stand. It clearly did not do so. This leaves no basis for a "grave doubt" as to the harmlessness of the error. *See id.*[13] The prosecutor's erroneous conduct, while regrettable, thus does not provide a basis for *habeas*

---

[12]The District Court observed that at least one other Philadelphia prosecutor has made an "inadvertent" disclosure comparable to the one at issue in this case. We share the District Court's concern about possible cynical motives behind these "slips." The harmless error standard may protect a judgment of conviction but it does not excuse attorney misconduct.

[13]This logic applies equally to Bond's contention that "another guy" is an obvious redaction that violated *Gray v. Maryland*, 523 U.S. 185 (1998), by revealing that the police knew the identity of the shooter. We note that Bond appears to have waived this argument by agreeing to this redaction and not objecting at trial. Moreover, even if we considered this argument and concluded that *Gray* had been violated, any implication that police knew the identity of the killer would be irrelevant in light of the prosecutor's actual identification of Bond as the shooter. As discussed, we hold that identification to be harmless. We perceive no cumulative effect of the two errors (the implication that police knew the identity of the shooter and the actual identification of Bond) that would allow relief when each error is individually harmless.

relief.

### 3.    Jury-Instruction Claims

#### a.    Reasonable Doubt

Bond contends that the trial court failed to explain that the Commonwealth had to prove each and every element of murder beyond a reasonable doubt. This failure, he argues, violates Pennsylvania law and provides a basis for *habeas* relief in that appellate counsel's failure to raise this point was ineffective assistance of counsel.

The trial court's opinion denying the PCRA petition does not discuss this issue and does not list it among the claims raised by Bond. The Pennsylvania Supreme Court denied Bond's PCRA appeal, holding that Bond had waived the underlying jury instruction claim by failing to raise it on direct appeal. *Bond*, 819 A.2d at 40 & n.3. It noted that Bond had not framed that issue as a question of counsel's ineffectiveness except in "a one-sentence statement at the conclusion of the argument . . . , baldly asserting that all prior counsel were ineffective for failing to litigate the issue." *Id.* at 40. The trial court explained that "[s]uch boilerplate allegations tacked on to waived claims of trial court error do not discharge appellant's burden of proving ineffectiveness." *Id.*

The resolution of this issue by the state courts led the District Court to conclude that this claim "has not been exhausted, and has been waived." *Bond*, 2006 WL 1117862, at *7. Bond contends that the doctrine of "relaxed waiver," which prevailed in Pennsylvania at the time of the state-court decisions, makes any state-law procedural ground inadequate to bar consideration of this claim in federal court. *See, e.g.*, *Jacobs v. Horn*, 395 F.3d 92, 117 (3d Cir. 2005) (explaining effect of relaxed waiver doctrine). We affirm even assuming that we may reach the merits of this claim.

The trial court failed to instruct the jury as clearly as it could that, to convict Bond of first-degree murder, it must find the existence of each of the elements of that crime beyond a reasonable doubt. The Pennsylvania Supreme Court has explained the necessity (under Pennsylvania law) of instructing the jury that the reasonable doubt standard of proof applies to each element of a crime. *See Commonwealth v. Bishop*, 372 A.2d 794 (Pa. 1977). It held that a general instruction regarding reasonable doubt was not enough. *See id.* at 796–97. However, it did instruct future courts sitting in review of jury instructions to read the charge

as a whole.  *See id.* at 796.

Here the jury instructions as a whole explained that the jury must find the presence of each element of first-degree murder beyond a reasonable doubt.  First, the trial court instructed: "[I]t is the Commonwealth that always has the burden of proving each and every element of each of the crimes charged and that the defendants are guilty of those crimes beyond a reasonable doubt."  This portion of the charge concededly could have been better.  The trial court could have added the words "beyond a reasonable doubt" after the word "charged," making it clear that the "reasonable doubt" standard applied to each of the elements.  But it did not need to do so.  The instruction provides the jury no basis for believing that, while a reasonable doubt standard applies to proof of the crime, some lower standard applies to proof of the individual elements.  The common sense way to read this portion of the charge is that the Commonwealth has to prove each element of the crime and that it must do so beyond a reasonable doubt.

This logical reading of the quoted portion of the charge is supported by the rest of the instruction.  First, the trial court repeated the beyond-a-reasonable-doubt standard on numerous occasions, reinforcing the implication that it was the relevant standard for the jury's deliberation.  Second, the trial court stated with respect to other charged crimes that the Commonwealth had the burden of proving each element beyond a reasonable doubt, reinforcing that principle in the jurors' minds.  Finally, the trial court did refer to both the beyond-a-reasonable-doubt standard and the need to prove each of the elements in the homicide charge, albeit separately.  Considering these factors along with the above-quoted portion of the instruction, we have no doubt that the charge, read as a whole, properly instructed the jury that it had to find each element of first-degree murder beyond a reasonable doubt.

We thus conclude that any claim brought under *Bishop* and its progeny would have failed on appeal in state court.  This defeats any ineffective assistance of counsel claim since there is no reasonable probability that the outcome of the state proceeding would have been different but for the failure of counsel to raise this jury instruction claim.  *See, e.g.*, *Albrecht v. Horn*, 485 F.3d 103, 128 (3d Cir. 2007) (stating that, to prevail on an ineffective assistance of counsel claim, a petitioner must establish prejudice by showing a reasonable probability that, but for attorney error, the outcome of the proceeding would have been different).

### b. Accomplice Liability

We also reject Bond's accomplice liability argument. The trial court's instructions were deficient on that question. It failed to instruct the jury that, to find Bond guilty of first-degree murder as Wheeler's accomplice, it must conclude that Bond himself had the specific intent to kill. Its instructions, as a whole, suggested that Bond was guilty of first-degree murder if Wheeler had the intent to kill and Bond was Wheeler's accomplice in the robbery. This was error because jury instructions violate a defendant's constitutional right to due process if they allow a jury to convict him of first-degree murder without finding that he had the specific intent to kill required by statute. *See, e.g.*, *Smith v. Horn*, 120 F.3d 400 (3d Cir. 1997).

We review this type of instructional mistake for harmless error, asking whether it had a substantial and injurious effect or influence in determining the jury's verdict. *See, e.g.*, *O'Neal*, 513 U.S. at 436. The jury in this case returned a first-degree murder verdict against Bond but only a second-degree murder verdict against Wheeler. First-degree murder is the killing of another with malice and a specific intent to kill. *Commonwealth v. Tolbert*, 670 A.2d 1172, 1179 (Pa. Super. Ct. 1995). Second-degree murder is the killing of another with malice during the commission of a felony. *Id.*

The jury could not have held Bond liable as Wheeler's accomplice because it found Bond guilty of first-degree murder and Wheeler guilty of second-degree murder. Even under the deficient jury instructions, only if it found Wheeler guilty of first-degree murder could the jury have found Bond guilty of first-degree murder under the accomplice liability theory. Put in layperson's terms, the jury found Bond was the killer and Wheeler the lookout. Bond thus cannot receive relief for any instructional error on accomplice liability. Nor was his counsel ineffective for failing to raise this claim upon appeal, as he could not have prevailed. *See, e.g.*, *Albrecht*, 485 F.3d at 127–29.

### B. The Commonwealth's Appeal of the Vacation of Bond's Death Sentence

The Commonwealth cross-appeals the District Court's decision vacating Bond's death sentence and remanding for another penalty hearing. The parties agree that this claim turns on the interpretation of *Strickland v. Washington*, 466 U.S. 668 (1984). That case allows relief for constitutionally ineffective assistance of counsel when counsel has provided deficient representation and that deficiency has prejudiced the defendant. The parties also

28

do not dispute that the deferential AEDPA standard of review applies. We therefore ask whether the Pennsylvania Supreme Court interpreted *Strickland* unreasonably or made unreasonable factual determinations when it decided that Bond received constitutionally effective counsel at the penalty phase.

### 1. Background of the Ineffective Assistance of Counsel Claim

Bond claims that his trial counsel was ineffective because they conducted an inadequate investigation prior to the penalty phase and as a result failed to present sufficient mitigating evidence at the sentencing hearing. He argues that counsel should have presented evidence of his poor mental health and dysfunctional family in support of relevant statutory mitigating factors. We recount in detail the events at issue to provide appropriate context before turning to our analysis of this claim.

### a. The Penalty Phase Hearing

### (i) Mitigation Testimony

Bond's counsel called seven family members and friends at the penalty phase hearing. They testified generally to Bond's good character and willingness to help others. Their testimony included the following.

– Bond's mother, Queenie Victoria Bond Connor, lived with Bond's father for the first six years of Bond's life, at which point the father walked out. Bond later developed a close relationship with his mother's then-husband, Charles Connor. The death of Connor greatly saddened Bond. Bond's oldest brother Robert helped discipline Bond and his other siblings. (Bond has five older siblings – Robert, Terry, Tony, Alphonso, and Carolyn.)

– Bond dropped out of high school because he was beaten up repeatedly. A few gangs operated in their neighborhood. Gang members beat him up because he did not join a gang.

– Bond was a good and fun-loving child. He used to play harmless practical jokes. He treated his elders with respect. He helped his

29

mother after doctors diagnosed her with diabetes and ran errands for other people in the neighborhood without accepting any payment.

–   Bond babysat his sibling's children. He participated in the Job Corps and had a series of jobs at restaurants and at a nursing home that he lost or left for various reasons. He could not join the military because he failed the General Educational Development test ("G.E.D.") by one point. He had stayed out of trouble prior to the robberies and murders that culminated in Lee's murder.

–   Bond has five children. Their mother, a gambler and drug user, lacks money to provide them with adequate food. He was attempting to gain custody of the children when police arrested him for Lee's murder.

(ii)   Penalty Phase Argument

The Commonwealth did not present evidence at the penalty phase or cross-examine the witnesses for Bond. It argued for the existence of aggravating factors on the basis of the trial testimony and a stipulation that Bond had been convicted and sentenced to life in prison for the second-degree murder and robbery of a restaurant owner that he committed ten days prior to the murder of Lee. It suggested in closing that the jury should hold Bond's "good core of family" against him, arguing that he deserved the death penalty considering how "many people have much more horrible backgrounds."

In contrast, counsel for Bond stressed his good qualities, his willingness to help others, his age and his lack of an extensive criminal history. Bond's counsel pointed to Bond's frustration at being unable to pass the G.E.D., the loss of his stepfather, his inability to gain custody of his children despite his willingness to work menial jobs, and the fear caused by living in a dangerous neighborhood. Bond's counsel stressed the severity of life imprisonment. He appealed to the jury's sense of charity and asked it not to impose the death penalty.

As noted above, the jury returned a verdict of death, which the Pennsylvania Supreme Court affirmed on direct appeal.

30

b.     The PCRA Hearing

The trial court held a seven-day PCRA hearing that included lengthy consideration of Bond's claim that he had received ineffective assistance of counsel at the penalty phase hearing. Bond, represented by new counsel, introduced school records reflecting a difficult childhood. Bond also presented testimony from three categories of witnesses: family and friends who testified to his dysfunctional family and awful childhood; his trial counsel who testified to their performance at the penalty phase hearing; and medical experts who testified to Bond's mental health problems.

School Records: Bond's school records demonstrate that he missed school on numerous occasions – accounting for as much as a third of individual school years – because of his impoverished background. A report card from first grade indicates: "[Bond] seems sleepy when he does come to school and is often unkempt." A school counselor visited Bond's home to investigate Bond's extensive absences when he repeated grade three at age ten. Bond's mother explained that he had not attended school because he did not have a coat. The counselor stressed to Bond's mother that she had a parental duty to send Bond to school and that the lack of a coat did not excuse his absences. The counselor had two more encounters with Bond's mother the next year. Bond's mother said on one occasion that Bond had missed school because the family had been without heat for two weeks and because he had been on the streets after she sent him out to work. She also noted some later absences on the ground that Bond had no shoes. The counselors lost sight of the family that summer, noting that it moved suddenly because "a sibling was involved in a serious community incident." The counselor included a note to follow up in the fall, but the records do not indicate whether a counselor did so.

Family and Friends: Bond presented the testimony of six family members and friends at the PCRA hearing (his mother, each of his siblings except Alphonso, and Barbara Epperson). Their testimony painted a very different picture than that presented at the penalty hearing. Two points emerged.

First, Bond endured an extremely troubled and deprived childhood. Bond's siblings testified that their mother drank and gambled extensively and that she physically abused Bond. Bond's sister gave a sense of the violent atmosphere of the home, for example, by recalling an occasion on which her mother threw a knife at her. Bond's family members described his childhood as one of poverty, disrupted by periods in which the family lacked

31

food, utilities, or adequate clothing. They discussed pervasive drug use in the home and the dangers caused by heavy gang presence in their neighborhood. They characterized their successes as the result of good fortune and their reliance on the church to which they belonged. They described Bond as having little to no chance of success given the character of his home and neighborhood. His mother testified, for example, about the absences from school caused by his unstable family circumstances, described her inability to provide him adequate formula as a baby, and stated that he ate lead paint chips at certain points in his youth.

Second, Bond's trial counsel did not inquire into Bond's background in any meaningful fashion. Bond's family members described brief and perfunctory discussions with trial counsel between the guilt and penalty phases of the Lee murder trial. Trial counsel did not inquire into family dynamics or background, Bond's family explained, although they would have testified on those topics if asked. One of Bond's brothers testified that he spoke with trial counsel during the trial for the first murder Bond committed, but that they did not discuss Bond's background.

Bond's trial counsel: Bond also presented the testimony of James Bruno, Bond's appointed trial counsel, and Dean Owens, who served as second chair (*i.e.*, support counsel) during the Lee murder trial. Their testimony regarding their minimal preparation for the penalty phase largely echoed that of Bond's family members.

*Testimony of James Bruno*: He has practiced law since 1979, with a primary focus on criminal law. He represented Bond in four proceedings, including the Lee case. He spoke to Bond's family as a group for about 15 minutes during Bond's trial for the murder and robbery of another restaurant owner. He spoke with an unknown member of Bond's family during the period between that murder trial and the Lee murder trial, and asked that all family members be available for a possible penalty phase. He did not talk with Bond's family again until after the jury returned the first-degree murder conviction Bond now challenges. He met with Bond's mother and one of his sisters in the late afternoon and early evening of the day of the verdict. He may have met with or called other family members at that time, but he did not recall doing so.

Bruno's plan at the penalty phase was to argue that a series of disappointments, such as Bond's failure to gain a G.E.D. and his stepfather's death, had triggered his crime spree. However, Bruno would have used the following information if he had it during the penalty

32

phase: an expert opinion that Bond's capacity to appreciate that his actions were criminal or to conform his conduct to the requirements of the law was substantially impaired; an expert opinion that he had a developmental age of 11 ½ at the time of the offense; evidence that he suffered from organic brain damage at the time of the offense and that the damage extended back to childhood; and testimony that a blow to the head in 1988 had exacerbated Bond's brain damage. Bruno possibly would have used (and at least would have explored) evidence that Bond's family was dysfunctional, that his mother drank heavily and gambled, and that she and her oldest son frequently beat her children, including Bond. Bruno lacked all this information. Bruno gave Bond's family members the opportunity to tell him about Bond's background, but Bruno testified that he "never really sat down and said tell me about [Bond's] background."

Bruno did not obtain or review Bond's school records pertaining to his head injury prior to or during his trial. Also, nothing shows that he obtained or reviewed Bond's hospital records.

Bruno retained Allan Tepper, Ph.D. to evaluate Bond, particularly with regard to his capacity to understand *Miranda* warnings. Bruno did not talk with Tepper after he received Tepper's report and did not inquire into the tests Tepper had administered or anything Tepper had learned about Bond's background.

Bruno allowed Owens to handle the penalty phase because Owens's life experiences allowed him to describe the rehabilitative possibilities of life imprisonment to the jury, and because it appeared that Bruno had not "clicked" with the jury.

*Testimony of Dean Owens*: He became an attorney in 1982 and had handled approximately 2,000 criminal cases for the Defender Association of Philadelphia ("DAP") prior to the Lee murder trial. He second-chaired that trial so that he could qualify to represent capital defendants after DAP began handling homicide cases. He understood his role to be that of an advisor to Bruno.

Preparation for the penalty phase did not begin in earnest until the jury returned its first-degree murder verdict. Bruno had expected a second-degree murder verdict and seemed shocked by the result. Owens helped Bruno during the interviews that occurred the evening before the penalty phase. He received no guidance from Bruno on how to conduct the interviews. Owens attempted to gather stories to establish three mitigating factors: Bond's

33

youthful age, 42 Pa. C.S.A. § 9711(e)(4), his lack of extensive criminal history, *id.* § 9711(e)(1), and "[a]ny other evidence of mitigation concerning the character and record of [Bond] and the circumstances of his offense," *id.* § 9711(e)(8) (this last factor is known as the "catch-all" mitigating circumstance). Neither Owens nor Bruno asked about Bond's absences from school, abuse Bond suffered as a child, the head injury Bond sustained in 1988, or the family's alcoholism and living conditions.

Owens and Bruno decided the night before the penalty phase hearing to do a dual closing so that the former could share his understanding of the rehabilitative effects of incarceration. The trial judge rejected this plan. This caused an impromptu meeting with Bruno and members of DAP in a hallway. Owens realized that he lacked experience but believed that he should take the lead role in the penalty phase because the trial had left Bruno exhausted. (Per Owens, Bruno looked like "someone had kicked him, [that] he had been kicked by a mule," after the verdict.) Several DAP lawyers disagreed with the decision that Owens would conduct the entire penalty phase, including the presentation of all evidence and argument.

Owens pulled together his thoughts quickly. The hallway discussion and preparation took no more than 15 minutes. He did not ask for further time to prepare for the hearing. He felt prepared when the hearing began but agreed in retrospect that he had not prepared sufficiently.

Medical experts: Three mental health experts testified for Bond at the PCRA hearing: Barry Crown, Ph.D.; Richard Dudley, M.D.; and Tepper. John Gordon, Ph.D., testified for the Commonwealth.

*Testimony of Barry Crown, Ph.D.*: He met with Bond for five hours and conducted a series of tests. Bond did not malinger during the testing. Bond has a mental age of 13 years, 5 months and an abstract reasoning age capability of 11 years, 5 months. This likely is an improvement from the time of the offense. Exposure to lead could have caused some of the developmental problems suffered by Bond. The head injury he suffered in 1988 could have caused brain trauma.

Bond has suffered from brain damage since childhood. His mother's abuse of alcohol may have caused pre-natal brain damage. Organic brain damage causes Bond to suffer from visual and auditory attention problems, to struggle with abstract problem solving, to act

impulsively, and to have great difficulty understanding the long-term consequences of his actions. The record contains nothing suggesting that he did not suffer from these problems at the time he shot Lee. Bond's capacity to appreciate the criminal nature of his conduct and to conform it to the requirements of the law was substantially impaired at the time he shot Lee.

Crown acknowledged the following during the Commonwealth's extensive cross-examination: he almost always testifies for the defense in criminal trials. He did not meet with Bond's family or read any records before meeting with Bond. Nor did he ask Bond certain probative questions (*e.g.*, about his alcohol and drug use, his employment history, abuse he suffered as a child, and his family dynamics). Academics dispute the reliability of some of the tests he administered to Bond. Other professionals might score Bond differently on some of the tests. Other causes than brain damage might have contributed to Bond's poor test scores. Not all individuals who test poorly or suffer from brain damage commit serious crimes.

*Testimony of Richard Dudley, M.D.*: Bond suffered neglect, along with physical and psychological abuse, as a child. His school records indicate severe cognitive impairment. Improvement in Bond's test scores correlates with the arrival of his stepfather.

Bond has little to no ability for abstract conceptualization, problem solving, or logical thinking. Bond likely suffered compromised cognitive functioning from birth, compounded by the history of abuse and neglect. The ingestion of lead paint chips, as well as fetal alcoholism, are consistent with a finding of organic mental deficit. The blow to Bond's head in 1988 could have exacerbated Bond's mental impairments.

Bond suffered from Post Traumatic Stress Disorder ("PTSD") and had extreme mental or emotional disturbance at the time he shot Lee. This substantially impaired Bond's ability to appreciate that his conduct was criminal or conform it to the requirements of the law. He believes that Bond acted impulsively and reflexively in shooting Lee. Potential causes of Bond's PTSD include the abuse he suffered as a child, being attacked by gang members, and the stillborn birth of one of his children.

On cross-examination, Dudley stated as follows. He lacked a number of documents at the time he examined Bond. Nothing in the record he reviewed proved that Bond suffered from abuse as a child and not just neglect. Poverty does not lead necessarily to neglect or

abuse. Bond actually scored well on the eighth grade language test, placing in the 51st percentile. Absenteeism explains some portion of his poor test results. Bond also appears to have given different accounts of his alcohol use to different people who examined him. He had a motivation to lie to Dudley.

*Testimony of Allan Tepper, Ph.D.*: Tepper examined Bond prior to the first murder trial. He had only discovery materials at the time. He tried to obtain information about Bond's background but could not do so. He lacked Bond's school and medical records when he drafted his report. Those records would have raised questions about the possibility of brain injury and the type of environment provided by Bond's family.

Tepper testified on cross examination as follows. He saw no evidence indicating that Bond did not understand the *Miranda* warnings given to him by police. He did not see evidence that Bond failed to understand the criminality of his conduct, but evidence suggested that he could not conform his conduct to the law. Tepper did not see evidence of an extreme emotional or mental illness when he evaluated Bond. The hospital and school records do not answer the questions they raise. Reasons other than organic brain damage could explain Bond's struggles. Bond scored above average on vocabulary and certain of his responses to Crown likely should have been scored higher.

*Testimony of John Gordon, Ph.D.* (for the Commonwealth): Gordon testified that the information relied on by Crown did not permit a diagnosis of organic brain syndrome or brain damage that significantly impaired Bond's ability to function. Crown administered some tests inaccurately and reported other results inaccurately. Test results were inconsistent in places. Properly scored, some tests would have put Bond in an average range, which would not comport with him having brain damage. Crown could have performed more tests to clarify his results but did not do so. Bond scored in the average, non-impaired range on the most sensitive test for brain damage. Bond can reason abstractly. Gordon could not conclude that Bond was malingering. Bond does not demonstrate impairment commensurate with brain damage or dysfunction. He scored better on right-brain activity, negating Crown's finding that the blow to Bond's head may have caused right brain impairment.

Gordon acknowledged the following on cross examination. Certain aspects of conducting various tests fall within the discretion of the tester; at least one aspect of Bond's testing performance is consistent with having suffered a blow to the head that caused loss of consciousness; Bond's hospital records relating to his head injury include indications

consistent with his having sustained a brain injury; and Bond's impulsivity is consistent with brain damage.

### c. The Pennsylvania Courts' Conclusion

The trial court denied the ineffective assistance claim within the PCRA petition. It concluded that the testimony of Crown and Dudley "was thoroughly refuted" by Gordon's testimony; Bond had not carried his burden of showing that he suffered from organic brain damage or PTSD at the time of the offense; and trial counsel presented sufficient mitigating evidence at the penalty phase to render any omission of further evidence non-prejudicial to Bond.

The Pennsylvania Supreme Court agreed. It concluded that trial counsel did not provide constitutionally ineffective assistance, in that they had "spoke[n] on a number of occasions with appellant and his family, but neither appellant nor his family members ever mentioned to counsel a history of abuse and family dysfunction." *Bond*, 819 A.2d at 45. It concluded that no "qualitatively better" course existed than that pursued by trial counsel, as the circumstances related by Bond and his family indicated that his "conduct in this case was aberrational and of recent vintage" and stemmed from the death of Connor (Bond's stepfather) and Bond's failure of the G.E.D. test. *Id.* The Supreme Court emphasized that Tepper had drafted a report for trial counsel prior to either of Bond's murder trials and that this report informed trial counsel of nothing "that would be helpful in terms of mitigation evidence." *Id.* It characterized trial counsel's approach as "a reasonable strategy" that "proved to be unsuccessful," and disagreed with Bond's contention that his trial counsel did not begin preparing for the penalty phase until after the jury had returned its verdict. *Id.* at 46–47. It also rejected Bond's argument that his trial counsel performed deficiently in failing to present mental health mitigation evidence. *Id.* at 47. The Supreme Court concluded that trial counsel had explored the possibility of presenting mitigation evidence by retaining Tepper's services and that it was bound by the PCRA court's determination that Gordon's testimony had "thoroughly refuted" the testimony of Crown and Dudley. *Id.* at 47–48.

### d. Proceedings in the District Court

The District Court heard extensive testimony at its hearing on Bond's *habeas* petition. However, only Dudley testified to the penalty phase ineffectiveness claim. He appeared briefly to testify that, from a mental health perspective, there was no basis upon which one

could conclude that Gordon's testimony had "thoroughly refuted" his (Dudley's) testimony at the PCRA hearing.

The District Court concluded that it "is very clear that, if counsel had fulfilled their obligation of conducting a reasonable investigation, very significant evidence could have been presented to the jury in mitigation of the penalty." *Bond*, 2006 WL 1117862, at *8 (internal citation omitted). It read the record as demonstrating that Owens "had not given much thought to the specific questions he would ask each witness" and that the witnesses "were frequently surprised and caught off guard by the questions that were asked." *Id.* at *9. It saw no basis in the record for the PCRA court's conclusion that Gordon "thoroughly refuted" the opinions of Bond's expert witnesses and concluded instead that trial counsel was "patently ineffective in a constitutional sense for failing to investigate and to uncover readily available evidence in support of additional specific mitigating factors." *Id.* Finally, it noted that Owens apparently operated on the incorrect assumption that sympathy provides a basis for mitigation under Pennsylvania law. *Id.* at *10.

### 2. Governing Law

*Strickland* imposes a two-part test for ineffective-assistance-of-counsel claims. First, it asks whether counsel performed deficiently. *Id.* at 687. This measures deficiency against the standard of "reasonably effective assistance," as defined by "prevailing professional norms." *Id.* at 687–88. If a petitioner satisfies the first prong of *Strickland*, he then must show that "the deficient performance prejudiced the defense." *Id.* at 687. This requires that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bond's penalty phase proceeding would have reached a different result if one juror had voted to impose a sentence of life imprisonment rather than the death penalty. *See* 42 Pa. C.S.A. § 9711(c)(1)(iv).

Three Supreme Court applications of *Strickland* provide particularly relevant guidance in this case: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005). We discuss each below.

The *Williams* Court agreed with the state post-conviction court's decision that trial counsel had been ineffective at sentencing and that this ineffectiveness had prejudiced the defendant. 529 U.S. at 395–397. The Supreme Court described trial counsel's failings as follows:

38

The record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* at 395 (internal citation and footnote omitted). The Court continued to detail trial counsel's failure to introduce evidence that Williams was "borderline mentally retarded" or to seek his prison records, which included details that reflected well upon him. *Id.* at 396. These failings did not indicate a strategic decision and prejudiced Williams within the meaning of *Strickland*. *Id.* at 396. The Supreme Court concluded that the Virginia Supreme Court's opposite conclusion was both "contrary to" and "an unreasonable application of" clearly established law. *Id.* at 397.

In *Wiggins*, trial counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. The Court concluded that the Maryland Court of Appeals' "assumption that the investigation was adequate . . . reflected an unreasonable application of *Strickland*." *Id.* at 528. It viewed the unreasonableness of the state court's decision as "highlight[ed]" by the "partial reliance on an erroneous factual finding." *Id.* While "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," or "to present mitigating evidence at sentencing in every case," *id.* at 533, the Court concluded that counsel nonetheless had been ineffective. It based its decision on the principle that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91). The Court found deficient

39

performance in counsel's conduct and concluded that the defendant had been prejudiced by the failure to present a stronger mitigation argument.

Counsel in *Rompilla* failed to examine a readily available prior-conviction file and thereby "seriously compromis[ed] their opportunity to respond to a case for aggravation." 545 U.S. at 385. The Court examined governing standards of attorney conduct and concluded that "[i]t flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the courthouse, open for the asking." *Id.* at 389. It found prejudice from this deficient performance because the defendant could have presented a much stronger mitigation case. *Id.* at 390. It therefore reversed our Court's opinion to the contrary. *Id.* at 379–80 (describing our decision, *Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004), as concluding that the Pennsylvania Supreme Court had not applied *Strickland* unreasonably since counsel had pursued their investigation far enough to leave them with reason for thinking that further efforts would not be a wise use of limited resources).

Our decision in *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006), also guides our analysis in this case. Counsel in that case failed to present significant mitigation testimony at the penalty phase and did not call a witness to provide a comprehensive social or psychiatric history. *Id.* at 406–07. As a result, the jury did not hear of Outten's family issues, his neurological condition, his psychological problems, and his substance abuse. *Id.* at 410–12. Trial counsel instead argued to the jury that "he was a good guy and that his life should be spared because he was actually innocent." *Id.* at 415. Counsel ultimately abandoned this strategy in closing. *Id.* at 416. He instead mentioned Outten's "horrendous record" and described Outten as "guilty." *Id.* Counsel even "failed in closing to focus on the positive aspects of Outten's character." *Id.* In that context, we concluded that the Delaware Supreme Court applied *Strickland* unreasonably when it decided that (i) counsel had not performed deficiently and (ii), even if he had, this deficient performance did not prejudice Outten. *Id.* at 419, 422–423.

We reached a comparable conclusion in *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005), in holding that Jacobs had shown deficient performance and prejudice under *Strickland*. We then turned to the question whether the contrary decision of the Pennsylvania Supreme Court was unreasonable such that AEDPA did not bar *habeas* relief. *Id.* at 106. That Court unreasonably applied *Strickland*, we held, in elevating one factor over other relevant factors. *Id.* It emphasized the finding of a psychiatrist while disregarding counsel's failure to provide

that psychiatrist with relevant information. *Id.* Accordingly, we remanded for a new trial on one of the two murders with which the Commonwealth had charged Jacobs (concluding in the process that counsel did not provide ineffective assistance in defending Jacobs against the other murder charge). *Id.* at 119.

We ordered *habeas* relief as to the penalty phase, but not as to guilt, in *Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001). Jermyn argued that his counsel had provided ineffective assistance at the guilt phase by failing to introduce sufficient evidence of Jermyn's insanity. We agreed with the District Court that the Pennsylvania Supreme Court was not unreasonable to conclude that trial counsel effectively placed the issue of Jermyn's sanity in evidence and that Jermyn was not prejudiced by the failure to introduce further, cumulative evidence on that point. *Id.* at 285. We also agreed with the District Court, however, that the Pennsylvania Supreme Court was unreasonable to conclude that trial counsel was not ineffective at the penalty phase. *Id.* at 305. The Supreme Court applied *Strickland* unreasonably, we explained, in concluding that counsel's failure to present available mitigating evidence did not prejudice Jermyn. *Id.* Noting that counsel "had been out of law school for less than two years, this was his first capital case, and he was 'overwhelmed' by the entire matter," *id.* at 308, we held counsel to be "ineffective because he failed to conduct an investigation, failed to prepare adequately for the penalty phase of Jermyn's trial, and consequently, failed to present substantial mitigating evidence that would have directly undercut the state's penalty phase case," *id.* at 306. Our conclusion largely rested on the extensive and "powerful" mitigating evidence that could have been presented, largely consisting of graphic accounts of physical abuse suffered by Jermyn that could have "provide[d] the jury with critical insight into the root of [his] mental illness," *id.* at 306.

### 3. Analysis of Bond's Ineffective Assistance of Counsel Claim

#### a. Deficient Performance

Trial counsel performed inadequately in preparation for and during the penalty phase of Bond's trial, falling below professional standards. We do not doubt that the prospect of representing a defendant at a capital penalty phase hearing can overwhelm even experienced lawyers. Nor does it surprise us that a first-degree murder verdict would disappoint defense attorneys who have worked hard during a trial. But that does not excuse trial counsel's failure to prepare for the penalty phase prior to the handing down of the conviction. These attorneys, particularly in the face of a record so full of testimony calling for a first-degree

41

murder verdict, should not have waited until the eve of the penalty phase to begin their preparations.

Counsel's failure to think ahead caused them to fail to inquire meaningfully into Bond's childhood and mental health. They did not obtain readily available school records portraying a much troubled youth. Nor did they seek medical records or conduct a meaningful inquiry into Bond's family life. They therefore failed to give their consulting expert sufficient information to evaluate Bond accurately. *See Rompilla*, 545 U.S. at 392 (describing medical experts as unable to find mitigating evidence because they were not provided adequate school, medical, and prison records). Trial counsel did not investigate possible mitigating circumstances or ask experts to do so. Instead, counsel conducted an *ad hoc* and perfunctory preparation for the penalty phase *the night before it began*. Their "strategy" relied on an uninformed guess as to the best available way to present Bond to the jury. We will not excuse this conduct on the ground that Bond and his family members did not tell counsel that his background provided fertile territory for mitigation arguments. Neither Bond nor his family had a duty to instruct counsel how to perform such a basic element of competent representation as the inquiry into a defendant's background. They did not, as the Commonwealth suggests, have to volunteer "red flags" about Bond's mental health when trial counsel should have discovered that information through a basic inquiry into his background.

The failure to perform a meaningful investigation violates prevailing professional norms as stated in the American Bar Association's Guideline for Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guideline") 11.4.1, which deals with investigations in capital penalty phases. It instructs counsel that an investigation for the penalty phase "should begin immediately upon counsel's entry into the case and should be pursued expeditiously," and that it should "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guideline 11.4.1(a), (c). *See also Outten*, 464 F.3d at 418 (discussing ABA Guideline 11.4.1 and explaining: "It was standard practice . . . for a death-eligible defendant's penalty phase investigation to include his medical history, educational history, family and social history, employment history, and adult and juvenile correction records."). Bond's trial counsel neither began their investigation at an appropriate time nor attempted to discover reasonably available mitigation evidence. They thus failed to meet prevailing standards of timeliness and quality.

Compounding the error of their failure to investigate, counsel decided at the eleventh hour that Owens, who never had participated in a death penalty case before, would take over full responsibility for the penalty phase. Bond, facing the ultimate penalty, should not have had counsel who was so inexperienced in this area and who improvised his penalty phase approach. We do not question Owens's dedication or zeal in representing Bond, but here no amount of good intentions makes up for his lack of experience and preparation.

In this context, we conclude that Bond's trial counsel provided him deficient representation at the penalty phase. The Pennsylvania Supreme Court applied *Strickland* in an objectively unreasonable fashion in concluding that counsel performed adequately. Its holding rests in part on the unreasonable factual determination that trial counsel began meaningful preparations for the penalty phase at a point prior to the eve of the penalty phase. The record includes no evidence to that end. Instead, the PCRA testimony of trial counsel and potential and actual penalty phase witnesses flatly contradicts that view. Trial counsel may have had brief communication with family members during an earlier proceeding, but the record before us shows that they did not prepare adequately for a capital penalty hearing.

The Pennsylvania Supreme Court also incorrectly concluded that Bond wishes to second-guess a reasonable strategy that backfired. It is difficult to call Bond's counsel's decisions "strategic" when they failed to seek rudimentary background information about Bond. Strategy is the result of planning informed by investigation, not guesswork. The record does not support the suggestion that Bond's counsel's investigation met prevailing professional standards. With the investigation predicate so deficient, we must reject any lack-of-deficiency determination even under the deferential AEDPA standard. This conclusion accords with decisions of the Supreme Court, *see, e.g.*, *Wiggins*, 539 U.S. at 527–28, and of our Court, *see, e.g.*, *Outten*, 464 F.3d at 419.

### b.    Prejudice

As noted above, to show prejudice under *Strickland*, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To repeat, for there to be a different result in this case, one juror would have had to vote for life imprisonment rather than the death penalty. *See* 42 Pa. C.S.A. § 9711(c)(1)(iv). We again apply the AEDPA standard of review, asking whether the Pennsylvania courts applied *Strickland* in an objectively unreasonable way when they concluded that any deficient

performance did not prejudice Bond. *See Outten*, 464 F.3d at 419–23.

The Pennsylvania Supreme Court did not rule explicitly on the prejudice question because it resolved the ineffective assistance claim on the first prong of the *Strickland* analysis. It arguably addressed prejudice in considering the Commonwealth's rebuttal testimony on the topic of Bond's mental illness. Even if it did, however, it did not add further reasoning than that provided by the PCRA Court. In this context, we conclude that we should review the PCRA decision since it either represents the state courts' last reasoned opinion on this topic or has not been supplemented in a meaningful way by the higher state court. This decision accords with those of seven of our sister circuit courts that consider the "last reasoned decision" of the state courts in the AEDPA context. *See Pinholster v. Ayers*, 525 F.3d 742 (9th Cir. 2008); *Mark v. Ault*, 498 F.3d 775 (8th Cir. 2007); *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006); *Sweet v. Secretary, Dept. of Corrections*, 467 F.3d 1311 (11th Cir. 2006); *Gunter v. Maloney*, 291 F.3d 74 (1st Cir. 2002); *Bledsue v. Johnson*, 188 F.3d 250 (5th Cir. 1999); *Boyd v. French*, 147 F.3d 319 (4th Cir. 1998). *See also Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991) (establishing presumption, in pre-AEDPA context, that federal courts should look through an unreasoned higher state-court opinion to the highest reasoned opinion).[14]

42 Pa. C.S.A. § 9711(e) identifies grounds for mitigation at the first-degree murder penalty phase. Trial counsel could and should have used evidence of Bond's mental health and background to establish three mitigating factors — two specific factors and the catch-all factor:

> (2) The defendant was under the influence of extreme mental or emotional disturbance.

> (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

> . . .

---

[14]In any event, we note that our resolution of this case would not change if we reviewed the Pennsylvania Supreme Court's opinion rather than the PCRA opinion.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

42 Pa. C.S.A. §§ 9711(e)(2)–(3) & (8).[15] We ask whether, but for counsel's deficient performance, Bond would have presented sufficient evidence in support of these mitigating factors to give a reasonable probability that one juror would have voted for life imprisonment.

Had they sought Bond's school and medical records, and followed up by appropriate consultations with experts such as Crown and Dudley, trial counsel could have presented substantial expert evidence on whether Bond was under the influence of an extreme emotional or mental disturbance at the time he shot Lee. Crown and Dudley testified precisely to this point. They stated that, at the time of the crime, Bond had a substantially impaired capacity to appreciate that his conduct was criminal or to conform his conduct to the requirements of law. This would have been strong testimony in support of the first two mitigating factors listed above.

The PCRA court did not find prejudice on this basis, however. It concluded that Gordon's testimony for the Commonwealth had "thoroughly refuted" the testimony of Crown and Dudley. We have reviewed the record closely and discern no such refutation. Gordon did not address large portions of Crown and Dudley's testimony. His testimony challenged Crown's conclusion that Bond suffered from organic brain damage, for example, but Gordon did not contest the testimony of experts and family members indicating that Bond suffered from psychological problems. Gordon also did not discuss Dudley's testimony, including Dudley's PTSD diagnosis. In fact, the Commonwealth introduced no evidence contradicting Dudley's PTSD diagnosis. The PCRA court's conclusion that Gordon had thoroughly refuted Dudley and Crown, rendering any claim based on their testimony "meritless," thus rests on an unreasonable factual determination.

Competent counsel also would have presented evidence of the abuse and neglect Bond suffered during his childhood in support of an argument under the catch-all mitigation factor. As demonstrated at the PCRA hearing, counsel could have obtained testimony from family

[15]We need not address whether counsel correctly attempted to establish Bond's age (25), *see* 42 Pa. C.S.A. § 9711(e)(4), and lack of criminal history prior to his crime spree, *see id.* § 9711(e)(1), as mitigating factors.

members that would have given the jury a very different impression than that left by the other penalty phase testimony. This testimony would not contradict earlier testimony, but rather provide details not uncovered by trial counsel at the penalty phase hearing. This testimony also would receive support from Bond's school records.[16]

The PCRA court rejected the claim that the failure to present this testimony prejudiced Bond. It concluded summarily that Bond had made no showing of prejudice. That court apparently equated the paltry testimony at the penalty phase hearing with the vastly expanded testimony provided by friends and family members at the PCRA hearing. The two sets of testimony brook no comparison. The first left the impression that Bond came from a supportive (if poor) family but went on a crime spree after the type of disappointments many people face in life. The second showed that he had grown up in an extraordinarily dysfunctional environment rife with abuse and neglect. The penalty phase testimony may have suggested some difficulties during Bond's youth, but this does not prevent relief. *Strickland* permits relief where, as here, trial counsel presented some mitigation evidence but could have introduced evidence that was upgraded dramatically in quality and quantity. The PCRA court's conclusion that Bond had failed to show prejudice, however construed, either reflects an unreasonable determination of fact (in the comparison of the two sets of testimony) or an objectively unreasonable application of controlling law (in denying relief on the basis that Bond already had presented some mitigating evidence).[17]

We thus agree with the District Court that Bond prevails on his penalty phase claim.

---

[16]Tepper also testified that access to the school records would have raised a number of other avenues of inquiry in his mind, including whether Bond suffered from brain injury.

[17]The PCRA court also appears to have departed from the appropriate standard under *Strickland*. It stated that standard at the beginning of its analysis, explaining that "[i]n order to show prejudice the defendant must demonstrate that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the trial could have been different." PCRA Opinion at 4. The PCRA court repeatedly spoke of Bond's "burden," however, as if he had to prove the truth of his assertions. It wrote the following: "[P]etitioner has failed to carry the burden of showing that, at the time of the offense, he was under the influence of extreme emotional or mental disturbance . . ."; and "[P]etitioner has failed to meet his burden of showing that he suffered from organic brain damage at the time of the offense . . . ." *Id.* at 8. We assume that the PCRA court used this phrasing as shorthand for the appropriate standard under *Strickland* since it did state that standard earlier in its opinion. As discussed above, however, the PCRA court applied *Strickland* in an objectively unreasonable fashion.

46

This conclusion finds support in interpretations of *Strickland* by the Supreme Court and our Court. Counsel performed an inadequate and tardy investigation into Bond's childhood like the counsel in *Williams*. The defense attorneys in *Wiggins* similarly abandoned their investigation "after having acquired only rudimentary knowledge of [their client's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Bond's trial counsel acted deficiently in ways similar to the counsel in *Rompilla*: both cases involve attorneys who failed to investigate readily available documents. So too did *Outten*, where the trial counsel failed to present evidence of the defendant's family issues, neurological condition, psychological problems, and substance abuse. We discerned prejudice even under the deferential AEDPA standard of review. We also concluded there was prejudice under the AEDPA standard in *Jacobs* and *Jermyn*. The latter case provides a particularly fitting analogy to the current dispute given its overwhelmed counsel who failed to conduct a sufficient investigation.

We do not conclude lightly that the PCRA court decided the question of prejudice in an objectively unreasonable fashion. But, as the cases above demonstrate, such a decision does not lack precedent. The Constitution guarantees that a defendant facing the death penalty receive effective assistance of counsel. Counsel for Bond failed to meet this constitutional minimum. Had they investigated Bond's background and mental health, they would have presented a starkly different picture of Bond to the jury at the penalty phase than the one they actually presented. A reasonable lawyer who understood Bond's life history would not have proceeded on the theory that he had led a productive life before going on a crime spree as a result of a series of disappointments. Such an attorney instead would have presented evidence to the jury of Bond's abusive and neglectful family life, his low intelligence, and his psychiatric and psychological problems. There is a reasonable probability that this different course, even in the face of competing expert testimony introduced by the Commonwealth, would have resulted in the imposition of a life sentence.[18]

We therefore conclude that the Pennsylvania courts applied *Strickland* unreasonably and made unreasonable determinations of fact in concluding that Bond's counsel did not perform deficiently and that this deficiency did not prejudice Bond. *See* 28 U.S.C. § 2254(d)(1)–(2). The Commonwealth must provide Bond with a new sentencing hearing within 180 days or impose a sentence of life imprisonment.

---

[18]We of course state no view about the proper outcome of a future penalty phase hearing conducted with constitutionally sufficient assistance of counsel.

We recognize the burden that this obligation places upon the Commonwealth, especially when it attempted to provide Bond with appropriate representation.  That effort does not permit us, however, to force Bond to bear the cost caused by counsel's ineffectiveness in preparing for the sentencing phase of Bond's trial.

## IV.    Conclusion

For these reasons, we affirm the judgment of the District Court.